JUDGE SCHEINDLIN

# 13 CIV 7678

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

PRECEDO CAPITAL GROUP INC. and
CONTINENTAL ADVISORS SA,

                                        Plaintiff,

     -against-

TWITTER INC.,

                                        Defendant.
-------------------------------------------------------------------x

Civil Action

**VERIFIED COMPLAINT**

Jury Trial Demanded

ECF Case

*(Stamp: RECEIVED OCT 30 2013 U.S.D.C. S.D. N.Y. CASHIERS)*

Plaintiffs **PRECEDO CAPITAL GROUP INC.** (hereinafter referred to as "Precedo Capital") and **CONTINENTAL ADVISORS SA** (hereinafter referred to as "Continental Advisors"), by and through their attorneys, Baratta, Baratta & Aidala LLP, make the following factual allegations applicable to each cause of action pled against **TWITTER INC.** (hereinafter referred to as "Twitter"):

## INTRODUCTION

1.      Defendant Twitter is an online social networking and micro blogging service that enables its users to send and read text based posts of up to 140 characters known as tweets. Twitter was founded in 2006 by Jack Dorsey, Evan Williams and Biz Stone as a Delaware corporation. From inception, Twitter has grown to be one of the most frequently used social Medias, allowing members to communicate directly with one another via a broadcast medium used on computers, electronic and mobile devices.

2.      As a private company, Twitter was never obligated to disclose any financial information to the public and apparently kept all financial information confidential. On October 3, 2013, Twitter filed a Form S-1 Registration Statement with the Securities and Exchange Commission ("SEC") under the Jumpstart Our Business Startups Act ("JOBS") for

1

purposes of commencing an Initial Public Offering ("IPO"). Clearly, it is Twitter's intention to enter the public market and sell Twitter securities to the public and to trade as a publically owned company on a national market.

3.      Similar to many private start-up companies in the social media field, Twitter paid employees and contractors for their services in restricted shares of Twitter stock. Twitter's preliminary prospectus discloses that all of the Twitter shares of stock paid to employees and contractors were highly restricted by Twitter pursuant to the terms and conditions established by Twitter, as well as being issued under Securities Law exemption provisions. Since the Twitter shares were restricted, Twitter stockholders could not sell their shares of stock without Twitter's approval.

4.      Twitter is a company in the same broadcast medium as Facebook, which completed an IPO approximately one year ago. Twitter was concerned about the filing of an IPO that could suffer the same market fate as Facebook. Twitter, as did Facebook, paid a number of employees, contractors, and other early-stage shareholders with Twitter stock. Before the completion of Facebook's IPO, however, their employees, contractors, and other shareholders were able to sell a number of private shares to less experienced, accredited investors in the private market at higher prices, because there was a lack of control in place by Facebook to manage the trading and oversee the price action of these transactions. The lack of "approved buyers" or the oversight of private trading by Facebook before the IPO took place had a volatile effect on the aftermarket trading in Facebook shares post IPO, which resulted in the price decline and losses for Facebook public stockholders who took part in the IPO.

5.      It was Twitter's plan to correct the random sale of Twitter stock by employees, contractors, and other Twitter shareholders prior to filing its IPO. Twitter wished to eliminate the overhang of Twitter stock that had already been issued by Twitter to employees and

2

contractors through managed sales and by controlling the buyers and sellers by establishing only "approved buyers" of Twitter stock. On information and belief, GSV Asset Management Inc. ("GVS Asset"), a shareholder of Twitter, represented that it had negotiated an agreement with Twitter wherein, if GSV Asset could secure the sale of blocks of $50,000,000 of shares up to $278,000,000 worth of Twitter stock owned by employees, contractors, and other stockholders to accredited investors under an exemption under the Securities Act, and through a mechanism that could manage these positions as an "approved buyer", Twitter would avoid one of the pitfalls of the Facebook IPO by removing an overhang of Twitter shares from the market and, at the same time, stabilize the trading market price as well as support a $10 Billion Dollar valuation of Twitter. Twitter knew that for GSV Asset to resell the Twitter stock, Twitter had to authorize GSV Asset to enter into Mandate Agreements with specific broker-dealers and financial advisory firms, to solicit and sell Twitter stock to accredited investors through such a vehicle.

6.      Twitter since inception has not had a profit from operations and was aware of and understood that Twitter was an investment risk as a result of having a short operating history in a new and unproven market. This made it difficult to evaluate Twitter's future prospects and its overall market valuation. On information and belief, the investment documents and financial projections, as well as relevant material information distributed by GSV Asset with Twitter's knowledge, disclosed that Twitter may not be able to monetize its existing business platform, manage its business growth or protect its proprietary rights from competitors and, in spite of its awareness, permitted the release of revenue projections that were misleading.

7.      Twitter was further aware that there was no standard method for valuating its business. Twitter, therefore intended to establish a market price which would be used by

Twitter to negotiate a price per share in a future IPO.  Upon Twitter making a future public offering of stock out of its treasury, Twitter sought to determine if a larger private market with multiple US and international buyers would bear $19 per share for a large amount of shares, effectively offered for the first time and for these purposes as a "de facto" public offering.

8.     Matthew Hanson, Managing Partner of GSV Asset ("Hanson"), contacted Plaintiffs Timothy Moran of Precedo Capital ("Moran") and Mark and Andreea Porcelli of Continental Advisors to enter into an agreement to market the "@GSV Fund LP" ("@GSV") a private Limited Partnership that can only purchase and hold 100% of Twitter shares. @GSV could only purchase Twitter shares owned by employees, contractors, or early-stage Twitter shareholders with the consent and approval of Twitter management, indicating that @GSV is an "approved buyer." The Twitter shares were to be held for a designated period of time such as a liquidity event in accordance with Twitter, or a Twitter IPO. GSV Asset entered into Mandate Agreements with both Precedo Capital and Continental Advisors whereby Precedo Capital and Continental Advisors would receive commissions and fees based on the purchase of Twitter stock by @GSV by obtaining the investors for @GSV, whereby such investors were both accredited investors and financial institutions. These investors would enter into subscription agreements with @GSV with the understanding that the Twitter shares would be delivered to @GSV at a price of $19 per share "or less" against payment on closing, and that GSV Asset would be the fund manager of @GSV and make liquidity decisions on behalf of the investors, and that GSV Asset would collect a management fee and a performance fee as compensation.

9.     Twitter intended to support a market price of Twitter stock by using Plaintiffs to secure high net worth and institutional investors to determine what the interest was in purchasing Twitter stock. Twitter's intention was to never sell the stockholders' shares that it controlled. Rather, Twitter, through Plaintiffs, would be able to establish a private market price

G:\BB&A\Current\2013\Clients\Continental Advisors\Complaint\Complaint 10-24-13 v 13.doc

that could be reasonably relied upon in an IPO. In fixing a private market floor price, Twitter's goal was to establish a market value. To induce Plaintiffs to obtain investors, Twitter, through GSV Asset, misrepresented that the reason for selling the stockholder shares of stock was to assure that there would not be a market overhang of Twitter stock. Plaintiffs reasonably relied upon this misrepresentation and secured accredited investors.

10.     The proposed pre-IPO sale of Twitter shares would reduce and/or eliminate a supply of aftermarket availability of Twitter shares as was understood by Plaintiffs, since following an IPO, the sale of the Twitter stock as well as the trading in the aftermarket upon completion of the IPO, is directly affected by the availability and supply of shares. It was represented to Plaintiffs that this transaction was approved by both Twitter and GSV Asset, and GSV Asset's counsel Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini").

11.     GSV Asset represented to Plaintiffs that Twitter authorized GSV Asset to create @GSV as the investment vehicle and to prepare slideshows of all of Twitter's historical non-public financial information projections going forward, as well as developmental business plans for presentation. GSV Asset provided the @GSV term sheet, offering documentation and subscription agreements and mandate agreements for Plaintiffs prepared by GSV Asset's counsel Wilson Sonsini, in order to plan for and have a GSV Asset representative attend road shows with Continental Advisors and Precedo Capital in order to obtain investments from accredited investors and financial institutions in @GSV.

12.     Road shows and investor presentations were scheduled in the U.S., Europe, and Asia based upon the agreements with GSV Asset. The road shows were extensive, had a deep breadth and depth of accredited and institutional investors world-wide, and therefore upon information and belief, Twitter was preparing to negotiate or was negotiating with

5

underwriters and investment banks for the IPO of Twitter's treasury stock and, in order to do so, Twitter was apparently testing the market price for its future IPO.

13.     During the 18-day international roadshow organized by Continental Advisors, 47 separate presentations in eight countries were made to institutional investors by representatives of GSV Asset and Continental Advisors. Precedo Capital made presentations to accredited investors and to ten broker dealers in New York, Chicago, Florida, Virginia and Pennsylvania. All necessary notice filings were filed in each state a presentation was made.

14.     Precedo Capital and Continental Advisors were able to obtain more than the initial $50,000,000 block in commitments and institutional indications for the purchase of Twitter stock. In fact, an escrow account was established by Precedo Opportunity Fund, a carve out of @GSV, wherein 4% of the gross sales were deposited and held in escrow in accordance with the agreements and the investment documents that were distributed to accredited investors by Precedo Capital. Although Precedo Capital and Continental Advisors were prepared to close the sales transactions under the Agreements with GSV Asset, GSV Asset postponed the closings and ultimately cancelled the offering. This caused Plaintiffs to suffer millions of dollars of losses in commissions, fees and expenses, in addition to business reputation losses, in not completing the sale of Twitter stock to the accredited investors and institutions that subscribed and indicated for the purchase of Twitter stock.

15.     Twitter prevented the sale of their employees' and contractors' securities from occurring once they learned that Precedo Capital and Continental Advisors were able to attract accredited investors and institutions to pay a price of $19 per share. This private market transaction, which upon information and belief was interrupted by Twitter, permitted Twitter to establish a sales price floor for a large amount of Twitter stock among multiple buyers, as well a $10 Billion Dollar market value for Twitter, in order to use this information in

6

negotiations with underwriters and investment banks to establish a market value of Twitter stock for filing their IPO.   This was done at a time when, unbeknownst to Continental Advisors or Precedo Capital or to the clients of both, shares were offered in the private brokered market for much lesser transactions at $17 per share or less.

16.     Upon information and belief, it was Twitter's intention and purpose to negotiate a high IPO price and to raise the market value for Twitter shares.  Moreover, Twitter, in having control over the employees' and contractors' stock, as they were restricted securities, would be able to avoid the volatility of its stock price that was experienced by Facebook IPO.

17.     Upon information and belief, Twitter knew that their misrepresentations would cause severe damages to Precedo Capital and Continental Advisors by authorizing GSV Asset to purchase Twitter stock by using @GSV and by allowing GSV Asset to enter into agreements, and to disclose non-public information at road show presentations to accredited investors and future IPO purchasers.

## THE PARTIES

18.     Plaintiff, Precedo Capital, is a Delaware corporation licensed to do business in the State of Arizona and is a licensed entity with the Financial Industry Regulatory Authority ("FINRA") that provides broker dealer and financial services.  Precedo Capital is paid commissions and fees for selling exempt securities to accredited investors.

19.     Plaintiff, Continental Advisors, is a Luxembourg corporation and is a non-FINRA financial consulting and advisory firm that acts as a financial advisor and consultant with respect to representing companies interested in placing securities with non-U.S. accredited financial institutions, brokers and investment banks that purchase securities.  Continental Advisors is paid consulting fees for its services for introducing companies to potential

purchasers for buying debt or equity directly from these companies or their stockholders if such transactions are culminated.

20.     Twitter is a Delaware corporation licensed to do business in the State of New York, and conducts business in New York State, and occupies the former Facebook premises in New York City. Twitter users communicate with large user bases by tweeting text-based messages through Twitter's website SMS, email or instant messaging. Twitter operates as a one-way one-to-many broadcasting network that allows users to find and follow anyone that tweets. Twitter uses its business model to promote advertisers through promoted tweets with the purpose of obtaining revenue from advertisers.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to diversity under 28 U.S.C. Section 1332.

22.     Venue of the following claims is laid in this district pursuant to 28 U.S.C. §1391(a) because a substantial part of the actions of Defendant Twitter giving rise to the claims herein occurred in the Southern District of New York.

## FACTUAL ALLEGATIONS

23.     Twitter designated GSV Asset as an approved buyer of Twitter common stock. Hanson represented, to Plaintiffs and accredited investors, on all telephone calls and at investor meetings that GSV Asset was "1 of 7 approved buyers" and the only entity to have an allocation of Twitter shares. As an approved buyer, GSV Asset was authorized to purchase shares of Twitter stock in a non-public offering. On information and belief, Twitter further entered into an agreement with GSV Asset to sell $278,000,000 worth of Twitter stock, of which was owned by Twitter stockholders and not by Twitter. The Twitter stock consisted of

approximately 14,631,579 shares of Twitter stock at or around $19 per share to be purchased by GSV Asset within @GSV on behalf of limited partners/investors in @GSV.

24.      On information and belief, Twitter dealt with GSV Asset prior to March 2012 with respect to the resale of Twitter stock, as GSV Asset is the investment manager and general partner of @GSV, whose sole purpose is to purchase and invest 100% in equity securities of Twitter.

25.      As a result of the course of dealings by and between Twitter and GSV Asset, Twitter represented that it had access to and available for resale $278,000,000 of stock owned by a group of Twitter shareholders.

26.      In or about March 2012 Twitter, through Hanson, represented to Plaintiffs, that GSV Asset had the authority to represent a group of Twitter shareholders that wanted to sell their Twitter stock with Twitter's consent, and that Twitter could deliver their shares.  GSV Asset maintained that they had received this information directly through interpersonal relationships with Michael Moe, Founder and Co-Managing Partner of GSV Asset ("Moe"), and Executives in the finance department of Twitter during monthly meetings which disclosed non-public financial and business information regarding Twitter.

27.      Upon information and belief, Twitter authorized GV Asset to enter into agreements with agents and/or broker dealers, namely, Plaintiffs, to promote and sell Twitter stock through @GSV. It is standard practice in the securities industry to deal directly with the lead underwriter and seller of securities, so that there was only communication with GSV Asset during the offering in which Plaintiffs relied on Twitter's representations through GSV Asset. Plaintiffs relied on Twitter's representations that they would and could sell Twitter stockholder's shares of stock, if the $50,000,000 block threshold was met by Plaintiffs. This disclosure information included projected revenue and profits of Twitter in the upcoming 2013

9

fiscal year, namely that Twitter was growing at a rate of 40% per quarter, equaling over 150% growth a year.

28.     Upon information and belief, Twitter approved and authorized an investor presentation in which GSV Asset would accompany Precedo Capital and sell the Twitter stockholder shares to accredited investors. At the road show and presentation by Precedo, that took place on April 18th, 2012 in Scottsdale, Az., Moe, an officer of GSV Asset, was authorized by Twitter to present to investors material information about Twitter. Moe presented various documents, prepared by Wilson Sonsini, Counsel for both Twitter and GSV Asset, to the investors at the presentation. These documents consisted of (1) @GSV Fund Indication of Interest; (2) @GSV Fund Term Sheet; and (3) GSV Asset Twitter Analysis and were presented for the purpose of inducing the accredited investors present to purchase Twitter stock.

29.     As Wilson Sonsini represented both GSV Asset and Twitter, upon information and belief, Twitter was made aware by Wilson Sonsini of the mandate agreements between Plaintiffs and GSV Asset, as well as the offering materials for the benefit of Twitter, which were used as a part of the presentations.

30.     Precedo Capital reasonably believed that Twitter wished to sell the stockholder's stock based upon that representation by Twitter through GSV Asset, and because Twitter, on information and belief, authorized GSV Asset to provide the documents at the presentation to the accredited investors.    Due to Precedo Capital's reliance on the representations and documents, Precedo Capital went on to continue to make presentations throughout the United States, and traveled to New York multiple times to sign agreements with investors and deposit payments to be held in escrow to purchase the Twitter stock.

31.     Initially, Twitter authorized GSV Asset to have Precedo Capital sell the shares of Twitter stock for $15.50 per share. After a few months, interest was generated in purchasing

10

the Twitter stock, and Twitter authorized GSV Asset to raise the price to $16.50 a share. Precedo Capital was not informed that Twitter was seeking $19 per share until after the Continental Advisors' Road Shows that took place in Europe and Asia, where there was substantial interest in purchasing Twitter shares at $19 per share. Upon hearing this, Moran, and his associate, contacted Matthew Hanson of GSV Asset and questioned the increase in price. Hanson stated clearly to Moran and the sales associate, that GSV Asset does not have control of the price. When questioned why GSV Asset does not have control of the price, Hanson's response was "Twitter is controlling the secondary market because they do not want another Facebook."

32.     Continental Advisors, like Precedo Capital, also reasonably relied on Twitter's misrepresentations made through GSV Asset. Hanson accompanied Continental Advisors on numerous road shows wherein investment presentations were made regarding the offering for sale of Twitter stock, pursuant to a Rule 501(a) of Regulation D under the Securities Act exemption. During the Continental Advisors road shows, Hanson made these presentations visually and verbally with a presentation slideshow, and only left offering documents, an @GSV Term Sheet, an @GSV Executive Summary, an @GSV Indication of Interest form, and an @GSV Escrow Agreement which were prepared by Wilson Sonsini, and the escrow account for investors was a trust account at Wilson Sonsini. Plaintiffs relied upon the representations of Twitter through Hanson that the Twitter shares were available for resale and purchase by @GSV, the revenue and business information was obtained from and authorized by Twitter, and that GSV Asset was authorized to participate and be a part of the road shows that were held for the specific purpose of reselling Twitter stock.

33.     The Continental Advisors road shows began on September 7, 2012 and ended on September 26, 2012. During the road show on September 17, 2012 Hanson reported that five

11

million shares of Twitter stock traded at $19 per share in an unknown private transaction, making it a $95,000,000 Dollar trade ticket. Twitter had 527 Million shares in its treasury stock, which resultantly valued Twitter at $10 Billion Dollars reportedly based on this trade, and he urged Plaintiffs to post this information to prospective clients and investors. Upon information and belief, since Hanson claimed that @GSV had the only Twitter share allocation, it was believed that Twitter provided this information to Hanson in order to induce Plaintiffs to contact all their known accredited investors and institutions to obtain firm orders for Twitter stock.

34.     At Continental Advisors' road shows and presentations, Hanson provided a power point presentation consisting of non-public material information that was provided by Twitter. This power point presentation consisted of over 45 slides promoting the Twitter business model. Twitter was aware that there valuation of the company was uniquely high for a company that had very little revenue. Therefore, Continental Advisors used these slides at the road shows to present Twitter's information to investors. Upon information and belief Twitter provided the slides to be used as propaganda to promote their business model that would also sustain their extremely high valuation.

35.     The slides on the power point presentation provided by Twitter consisted of financial growth information that would induce investors to purchase the shares of Twitter stock at $19 per share.

36.     Specifically, slide 5 offered investors "Investment Highlights", including "explosive growth", "Revenue of 158 million, expected to grow at 150% in the following year", "800 Million of capital raised", "Strong tailwinds of megatrends – Globalization, Internet, Brands, Convergence, Mobile", "Allows advertisers to achieve "Holy Grail"- Pinpoint targeting", "Exclusive access – GSV is one of a handful of approved buyers of Twitter."

12

37.    Slide 7 depicted Twitter as the "New Communication Medium" to portray how many people use Twitter. Slide 15 presented a bar graph showing how time spent on Twitter turns into advertisement dollars in revenue for Twitter. Slide 17 discussed the "Massive Global Ad Market" and slide 29 depicted Twitter as an "Advertising Powerhouse."

38.    Slide 32 targets the investors in showing potentially how big Twitter can be, namely through another bar graph showing the potential growth of their investment in Twitter company. Slides 36 and 37 on the power point presentation displayed projected revenue and Earnings Before Interests and Taxes (EBIT) for the years 2012 through 2014. Moreover, Price Earnings and Price Revenue ratios for the years 2012 through 2014 were also listed in the information provided by Twitter for the presentation to accredited investors and institutions. Further, for the 2012 fiscal year, Twitter was expected to have $408 Million Dollars in revenue with a flat EBIT, and in fiscal year 2013, the projected revenue was to be approximately $1.2 Billion Dollars with an EBIT of $300 Million Dollars.

39.    Slide 38, outlined Twitter Financing History and slide 49 brought attention to "Dataminr" a company Twitter partnered with to "build an unpatrolled breaking news service."

40.    The above mentioned slides were displayed at the European and Asian road shows to induce investors to believe that Twitter's valuation for an opening IPO price was a minimum or greater than $19 per share for Twitter stock, and allow Twitter to value its company in excess of the $10 Billion Dollar valuation.

41.    Moreover, the slides reasonably induced Continental Advisors to believe that Twitter intended to sell the stockholders' shares of Twitter stock. Twitter presented a substantial amount of non-public information to be displayed at the road shows and presentations, and Continental Advisors reasonably believed that it was used to lure the investors into purchasing the Twitter stock.

42.     Ultimately, Plaintiffs both secured interested accredited investors who agreed to purchase Twitter stock. Precedo Capital arranged for the purchase of between 2,263,157 and 2,526,316 Twitter shares depending on final pricing and closing documents for the sum of $43,580,000 representing 22 buyers. Continental Advisors was in the process of arranging for the purchase of up to $216,500,000 worth of Twitter shares at $19 per share with indications thereof, when Twitter interrupted @GSV. Precedo and Continental Advisors had secured or were arranging for the sale of up to $278,000,000 worth of Twitter stock.

43.     As a part of Twitter's strategy to find a new threshold price, upon information and belief, Twitter authorized GSV Asset to enter into Mandate Agreements with Plaintiffs, so that Plaintiffs would solicit fund managers, asset managers, family offices, and broker dealers that could attract a wider range of accredited investors who would have interest in purchasing the $278,000,000 worth of shares of Twitter stock prior to an IPO. This was intended to justify a valuation of $10 Billion Dollars for Twitter.

44.     Upon information and belief, Twitter had knowledge of the Mandate Agreements with Plaintiffs and permitted GSV Asset to offer Twitter stock for sale through @GSV, pursuant to an exemption under the Securities Act, in order to determine if the $19 per share value of Twitter stock could be maintained and supported with accredited investors and institutions in the private market.

45.     Upon information and belief, Twitter was aware that Plaintiffs and GSV Asset's actions in promoting and attending road shows with Hanson in order to obtain investors in @GSV that would attract great interest by accredited and institutional investors. Moreover, Twitter was aware and provided to GSV Asset all of the preparation materials, which consisted of financial and revenue projections. These documents were based upon the value of Twitter as estimated by Twitter for the total issued and outstanding shares of Twitter.

46.     Precedo Capital entered into a Mandate Agreement with GSV Asset on May 6, 2012 to sell Twitter stock through a carve out of @GSV, as the Precedo Opportunity Fund. Continental Advisors entered into a Mandate Agreement with GSV Asset as of August 20, 2012 to sell @GSV which would hold 100% Twitter stock, essentially the same agreement as entered into by Precedo Capital.   Based upon these agreements, Precedo Capital and Continental Advisors requested and received business and financial information in the form of sales and revenue projections of Twitter from GSV Asset.  The revenue projections and other business information were represented to be directly from Twitter by Hanson, in fact.

47.     On information and belief, Twitter took part in the valuation strategy along with GSV Asset to try and find a market support price of Twitter by offering Twitter stock for sale to investors by way of a test market procedure, and then by withdrawing the private offering. Twitter knew that Precedo Capital and Continental Advisors were in the process of obtaining investors to sell them Twitter stock, and that to withdraw the shares from the private market, both Continental Advisors and Precedo Capital would sustain damages, as accredited buyers had already committed for the purchase of Twitter's stock.  The cancellation of the offering was couched to give the impression that the value of Twitter was rising as the demand for Twitter shares was increasing, so that the inference was that the $19 per share price would increase with an imminent IPO of Twitter stock.

48.     Twitter never intended to complete the private sale of Twitter stock.  Twitter's intention was to induce Precedo Capital and Continental Advisors to create an artificial private market wherein Twitter could maintain that a private market existed at or about $19 per share for the Twitter stock.  As a result of Precedo Capital and Continental Advisors actions, Twitter was successful in achieving a substantial market valuation for the goal of establishing a price range for a Twitter IPO.

49.    Continental Advisors, in reliance on the representations that GSV Asset had Twitter's authorization to resell Twitter shares at or around $19 per share, and the fact that Twitter provided a substantial amount of non-public information at the road shows and presentations, was making arrangements for accredited foreign-based financial institutions to purchase up to 11,395,000 shares of Twitter stock when GSV Asset cancelled the @GSV offering.

50.    Moran, as a licensed FINRA broker, made a Due Diligence visit to GSV Asset in May of 2012, then he presented the Precedo Opportunity Fund, LP, a carve out of @GSV, in Chicago in June of 2012 and in New York in July of 2012.  Further, at the beginning of the European roadshow on September 7, 2012 along with Mark Porcelli, a director of Continental Advisors, which was then followed on by Hanson beginning on September 12, 2012 in Geneva until the Continental Advisor roadshow ended in Singapore on September 26, 2012.  Moran made numerous trips to the city and state of New York and solicited brokerage firms and accredited buyers by use of a Private Placement Memorandum which was known by Twitter.

51.    As a direct result of Precedo Capital's efforts, buyers of Twitter stock were located and Subscription Agreements were signed wherein buyers purchased $43,580,000 amounting to 2,293,684 shares at $19 per share, pursuant to the offering terms, which required payment of 4% of the amount of Twitter stock purchased to be deposited in escrow until closing when the balance would be paid by the buyers upon delivery of the securities.  The sum of $4,100,000 was deposited in the Precedo escrow account awaiting the delivery of Twitter securities to the buyers.

52.    GSV Asset postponed the closing date for the sale of the Twitter stock on two occasions and, subsequently, terminated the agreement without cause or justification.  Twitter, thereafter, claimed that there was no such agreement with GSV Asset to sell any Twitter

securities, and that @GSV was not authorized to sell Twitter stock, even though Twitter was fully aware of the road shows and presentations made by Precedo Capital and Continental Advisors. This situation induced both Plaintiffs to incur substantial losses.

53.    GSV Asset agreed to pay $.75 per share to Precedo Capital for each share of Twitter stock for the sum of $1,720,263, and a management fee of 1% equaling $435,800 for 12 months and one-half of the carried interest or performance fee, so that Precedo Capital's commission and management fee would total $2,156,063 for arranging the placement of the Twitter stock through the Precedo carve out of @GSV.

## COMMON LAW FRAUD

54.    Plaintiffs repeat and re-allege Paragraph 1 to Paragraph 49, as if fully set forth herein.

55.    Upon information and belief, Twitter authorized GSV Asset to act as their agent and representative for the resale of Twitter stock, as the presentations held in New York by Precedo Capital, attendees which consisted of 10 financial institutions as follows: Hightower Capital, Stillpoint Capital, NewBridge Securities, Griffin Financial, RC Securities, Maxim Group, Furtherlane Asset Management, National Planning Group, and Source Capital and as many as 12 high net worth accredited individual buyers. Continental Advisors, in accordance with the custom and practice of the securities business in dealing with accredited financial institutions, obtained indications of interest to buy @GSV from eight institutions, and was prepared to close on investor purchases of @GSV for the resale of Twitter stock, when Continental Advisors was informed by Hanson that Twitter had determined to cancel the sale of Twitter stock.

56.    Plaintiffs reasonably believed that Twitter authorized GSV Asset to act as their agent and representative through the various documents that GSV Asset provided by Twitter, namely the fund documents presented at the Precedo Capital Road shows drafted by Wilson

17

Sonsini, Twitter's attorneys and the substantial non-public documents valuating Twitter's business model, which was and could only be provided by Twitter financial management.

57.     Twitter used Precedo Capital and Continental Advisors in conjunction with GSV Asset to support the value of Twitter stock on the private market. Twitter however, did not disclose to GSV Asset or Precedo Capital and Continental Advisors that it was cancelling the @GSV offering until nine days after the roadshows had ended and ongoing new conference call presentations and follow-ups were still commencing. In fact, during the nine days after the final road show, Continental Advisors continued to make follow-up conference calls with interested fund managers who had further questions about Twitter, which were still commencing.

58.     On information and belief, in furtherance of its intent to misrepresent to Plaintiffs, Twitter, on September 27, 2012, gave its first media interview since its founding in 2006. Dick Costolo, CEO was interviewed on CNBC and was aired world-wide, coincidently on the day of the end of the international roadshow in Singapore.

59.     Upon information and belief, it was Twitter's intention to never allow the resale of the stockholders' shares. Twitter, through GSV Asset, represented to Plaintiffs that they desired to sell Twitter stock of Twitter stockholders merely to induce Plaintiffs to contact their accredited investors and institutions to determine their interest in Twitter shares. Upon information and belief, Twitter permitted these roadshows and presentations and the dissemination of non-public information in order to obtain a threshold price for its shares, and not to sell the stockholders' shares.

60.     Twitter, through GSV Asset, represented to Plaintiffs that Twitter desired to sell $278,000,000 worth of Twitter stock owned by Twitter stockholders and not Twitter, knowing

this to be false. Rather, it was Twitter's purpose to fix a private market floor price through the accredited investors that Plaintiffs would obtain.

61.     Precedo Capital reasonably relied on these misrepresentations because of GSV's actions authorized by Twitter, namely attending road shows and presentations and providing the offering documents prepared by Twitter's counsel (Wilson Sonsini). Continental Advisors reasonably relied on Twitter's misrepresentations, through GSV Asset, because of the information provided by Twitter for their road shows, namely, the excess of 45 slides in a power point presentation, provided by Twitter, disclosing material non-public information regarding Twitter's business model.

62.     Precedo Capital provided investment documents which were signed by accredited investors and funds were deposited in the established escrow account of Precedo Capital awaiting wire transfer to the @GSV escrow account at Wilson Sonsini. Precedo Capital had deposits in the sum of $3,860,000 ($500,000 was escrowed at Investment Law Group in Atlanta, GA), which represented 4% of the offering price for shares of Twitter stock valued at $19 per share.

63.     Continental Advisors, as a result of the road show presentations whereby Continental and @GSV met with 47 institutional fund and asset managers in seven European countries and in Singapore, as well as on conference calls lead by Hanson with 16 fund managers, obtained from accredited financial institutions indications of interest for up to - $216,500,000 representing 11,395,000 number of shares of Twitter stock. Continental Advisors followed the custom of financial institutions by providing both verbal and written indications of interest, which is tantamount to a commitment, and to make payment for the total amount due on closing for @GSV in exchange for the delivery of shares of stock purchased.

64.    Precedo Capital and Continental Advisors were unable to deliver the shares of Twitter stock they sold or otherwise had indications for, to their clients. The failure to deliver the shares and complete the transactions resulted in substantial losses for both Precedo Capital and Continental Advisors. These losses included fees, commissions and out-of-pocket expenses incurred in obtaining the accredited purchasers of Twitter stock.

65.    Both Plaintiffs suffered substantial damages due to Twitter's misrepresentation since they were unable to close on the sale of Twitter stock. Specifically, Precedo Capital lost the sum of $1,720,263 at $.75 per share of Twitter stock, and a management fee of 1% or $435,800 for 12 months and one-half of the carried interest or performance fee, so that Precedo Capital's commission and management fee is the sum of $2,156,063 plus "Carry"and $104,145.14 of marketing costs, legal, and travel. The "Carry" consists of 50% of performance by Precedo, which was in the Mandate Agreement drafted by Wilson Sonsini.

66.    Further, Continental Advisors lost up to $22,077,500 of total compensation if allowed to complete the offering. These losses include placement fees at $.75 per share. Continental Advisors were authorized to place 11,395,000 shares under the Mandate Agreement. At $.75 per share, Continental's loss is $8,546,250. Moreover, according to the Mandate Agreement, Continental Advisors was entitled to half of 1% of the upfront annual management fee, which equals $1,082,500. Continental Advisors was also entitled to half of the 10% Performance Fee of the shares. Finally, Continental had borne all out-of-pocket expenses for travelling during the roadshow through eight countries and two continents and loss of unearned income amounting to $150,000.

67.    Twitter's misrepresentations to both Plaintiffs were so wanton and egregious that punitive damages are warranted.

68.     Twitter never intended to complete the offering on behalf of Twitter stockholders, in the private market, thereby causing substantial damages to the Plaintiffs in the loss of commissions, fees and expenses, as well as through their business reputation.

69.     Twitter's wanton disregard for damages to Plaintiff's business reputation, in its dealings with financial institutions and accredited investors, caused Plaintiffs substantial harm, in that Plaintiffs were unable to deliver the shares that were offered as per Twitter's representations, which also damaged Plaintiffs' credibility.

70.     Twitter's actions caused a series of events to occur, namely that Plaintiffs set up a series of road show presentations, both in the U.S. and in Europe and Asia, and made presentations at those road shows which resulted in accredited investors and financial institutions the offer to purchase Twitter stock at or about $19 per share.  This would have permitted Twitter stock to be offered at a higher IPO price.

71.     The Public as a whole is injured because the IPO price of Twitter shares is not justified by standard methods of valuation, i.e. price earnings ratio and balance sheet valuations.  Rather, the IPO price per share would be fixed by this method, which in turn injures the public because the public will now be purchasing shares at an inflated price, based upon Twitter's pre – IPO fraudulent misrepresentations.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiffs respectfully request that the Court:

(a)    Order that Defendant pay Plaintiffs compensatory damages in the amount of $24,233,563 due to lost fees, commissions and expenses;

(b)    Order that Defendant pay Plaintiffs consequential damages for future loss of business and damage to their business reputation in an amount to be determined at trial;

(c)    Order that Defendant pay Plaintiffs costs of this action, including reasonable attorney's fees and expenses;

(d)    Order that Defendant pay Plaintiffs any and all damages sustained by Plaintiffs arising from the foregoing wrongful and unlawful acts of Defendant;

(e)    Order that Defendant pay Plaintiffs punitive damages in an amount of One Hundred Million Dollars;

(f)    Order such other and further relief as to this Court may seem just and proper.

Dated:  New York, New York
        October 24, 2013


                                Respectfully submitted,

                                BARATTA, BARATTA & AIDALA, LLP


                                Joseph P. Baratta
                                546 Fifth Avenue, 6th Floor
                                New York, NY 10036
                                (212) 750-9700
                                (212) 750-8297
                                *Attorneys for Plaintiffs*

22

VERIFICATION:

STATE OF ARIZONA       )

                              :ss

COUNTY OF MARICOPA   )

      I, TIMOTHY MORAN, being sworn, say: I am a Managing Partner of Precedo Capital Group Inc., a Delaware corporation and a party in the within action; I have read the foregoing Complaint and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated be alleged upon information and belief, and as to those matters I believe it to be true. This verification is made by me because the above party is a corporation and I am an officer thereof.

The grounds of my belief as to all matters not stated upon my own knowledge are as follows: books and documents located in file.

TIMOTHY MORAN

Sworn to before me on
October 23 2013



Notary Public

OFFICIAL SEAL
SARAH E. McQUADE
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Expires Aug. 19, 2017

**VERIFICATION:**

STATE OF NEW YORK       )
                        :ss
COUNTY OF NEW YORK      )


    I, ANDREEA PORCELLI, being sworn, say: I am a Partner of Continental Advisors SA, Inc., a Luxemburg corporation and a party in the within action; I have read the foregoing Complaint and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated be alleged upon information and belief, and as to those matters I believe it to be true.  This verification is made by me because the above party is a corporation and I am an officer thereof.

The grounds of my belief as to all matters not stated upon my own knowledge are as follows: books and documents located in file.

                                    ANDREEA PORCELLI

Sworn to before me on
October ⁊, 2013

Notary Public

NANCY H SCHAAFF
Notary Public, State of New York
No. 01SC6265547
Qualified in Kings County
Commission Expires July 09, 2016