UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x          Civil Action

PRECEDO CAPITAL GROUP LLC. and
CONTINENTAL ADVISORS SA,                                                              13-CV-7678 SAS

                                                        Plaintiffs,

        -against-

TWITTER INC.,

                                                        Defendant.
-------------------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**


                                        BARATTA, BARATTA & AIDALA, LLP
                                        546 Fifth Avenue, 6th Floor
                                        New York, NY 10036
                                        (212) 750-9700
                                        (212) 750-8297
                                        *Attorneys for Plaintiffs*


Dated:  New York, New York
            March 12, 2014

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT   …………………………………..……………….…   1

STATEMENT OF FACTS   ………………………….…………………………………   3

ARGUMENT   ………………………………………………………………………..   7

POINT I:      LEGAL STANDARD   …………………….…………………………..   6

POINT II:     TWITTER, THROUGH THEIR CONDUCT AND OMMISSIONS,
              ARE LIABLE FOR STATEMENTS MADE BY GSV ASSET   ………..…..   10

POINT III:    PLAINTIFFS HAVE ALLEGED FRAUD WITH PARTICULARITY   …….   19

POINT IV:     PLAINTIFFS HAVE PLED COMPENSABLE DAMAGES   ……………….   24

CONCLUSION   ……………….…………………………………………………………   25

**TABLE OF CASES**

Page

*Aschcroft v.Iqbal,* 556 U.S. 662, 678 (2009) ….……………………………………………  7

*ABF Capital Mgmt v. Askin Capital Mgmt, L.P.,* 957 F.Supp. 1308, 1327 (S.D.N.Y. 1997)……  8

*Baxter Diagnostics, Inc. v. Novatek Medical, Inc.*, 1998 WL 665138 (S.D.N.Y. 1998) ……….  25

*Chill v. Gen Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) …………………………………………22,23

*Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987) ……………………..  22

*Columbia Broadcast Systems Inc. v. Stokely – Van Camp Inc.*,
    522 F.2d 369, 375-76 (2d Cir. 1975) …………………………………………………..  10

*Dress Shirt Sales Inc., v Hotel Martinique*, 12 NY2d 339, 344 ……………………………….  24

*E.F. Hutton & Co. v. First Florida Securities, Inc.,* 654 F.Supp. 1132, 1142 (S.D.N.Y 1987) ...  9

*Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008) ……..………………………………………  7

*IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.,* 26 F.3d 370, 375 (2d Cir.1994)……  9

*In re Bennett Funding Group,* 336 F.3d 94, 101 (2d Cir.2003) …………….…………………  9

*In re Fuwei Films Securities Litigation* 634 F.Supp2d 419, fn3 (S.D.N.Y. 2009) …………….  25

*In re Optimal U.S. Litigation*, 837 F.Supp.2d 244, 252 (S.D.N.Y. 2011)(Scheindlin, J.) ……….  10

*In re South African Apartheid Litigation*, 633 F.Supp.2d 117, 122 (S.D.N.Y. 2009)
    (Scheindlin, J.) ………………………………………………………………………*passim*

*International Motor Sports Group, Inc. v. Gordon*, No. 98-5611,
    1999 U.S. Dist. LEXIS 12610 at 11 ………………………………………………………*passim*

*Kolbeck v. LIT Am, Inc.*, 923 F.Supp. 557, 568 (S.D.N.Y. 1996) …………………………….  21

*Lama Holding Co. v Smith Barney Inc.*, 88 N.Y.2d 413 (N.Y.1996) …………………………  24

*Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936) …………………………………….……  9

*Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990) (citations omitted) …………….....  8

*Phelan v. Local 305 of the United Ass'n of Journeymen,*
    973 F.2d 1050, 1062 (2d Cir.1992)       ………………………………………………….  9

*Property Advisory Group, Inc. v. Bevona*, 718 F.Supp. 209, 211 (S.D.N.Y. 1989) …………..…*passim*

*Rey-Willis v. Citibank, N.A.*, 2003 WL 21714947 (S.D.N.Y. 2003)(Scheindlin, J.) …………… 8,20

*Rosenblum v. Thomson Reuters (Markets) LLC*, 2013 WL 5780775 (S.D.N.Y. 2013)
  (Scheindlin, J.) …………………………………………………………………………*passim*

*Sager v Friedman*, 270 NY 472, 481 ……….……………………………………………....  24

*Simms v. City of New York,* 480 Fed. App'x 627, 629 (2d Cir.2012) ……………………………  7

*Walker v. Sheldon*, 10 N.Y.2d 401, 404–05, 223 N.Y.S.2d 488, 179 N.E.2d 497, ...…………...  25

*Wight v. Bankamerica Corp.,* 219 F.3d 79 (2d Cir.2000)  …………………………………..…  8

*Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 Fed. App'x 744 (2d Cir. 2009)  …….  19

## **TABLE OF AUTHORITIES**

Page

Rule 12(b)(6)……………………………………….……………………………………*passim*

Rule 9(b)  …………………………………………………………………………….*passim*

## PRELIMINARY STATEMENT

Precedo Capital Group LLC ("Precedo") and Continental Advisors SA ("Continental") Plaintiffs, informed Defendant Twitter Inc. ("Twitter") of its fraud and misrepresentation claims more than five (5) months prior to Twitter filing its Form S-1 Registration Statement for its Initial Public Offering ("IPO").

Twitter had publicly maintained that it did not want to make the same trading market mistakes that were made by Facebook, Inc. ("Facebook"), prior to Facebook filing its IPO and becoming a publicly-owned company.  Twitter, similar to Facebook, as alleged in Plaintiffs' second amended complaint ("SAC") paid a number of contractors, employees and early-stage shareholders with shares of Twitter stock.  It is alleged that Twitter was concerned that, immediately following the completion of its IPO and the opening for public trading, that substantial amounts of Twitter stock, owned by third-party Twitter stockholders, could be sold into the public market and could cause a sharp drop in the trading market price of Twitter.

Twitter's preliminary statement in its Memorandum of Law ("MOL") is noticeably silent with respect to its denial of GSV Asset Management Inc.'s ("GSV Asset") actions taken on Twitter's behalf, as its agent.  Twitter simply states that, "if Plaintiffs were misled, it was not by Twitter" (Page 1 of Twitter's MOL).  Twitter fails to recognize that all of its overt actions resulted in an agency relationship with GSV Asset.  Twitter is trying to claim plausible deniability of the allegations pleaded in the FAC, as opposed to the reasonable reliance of Twitter's actions which is pleaded by Plaintiffs.  Plaintiffs have specifically pleaded that Plaintiffs relied upon Twitter's agent (GSV Asset), an approved buyer designated by Twitter, one of only seven approved buyers, in entering into Mandate Agreements with GSV Asset to sell third-party Twitter stock to institutions and Financial Industry Regulatory Authority ("FINRA")

broker dealers, in a private exempt sale transaction of $278,000,000 in shares of Twitter stock owned by third-party Twitter stockholders at $19 per share.   Plaintiffs have further alleged that Twitter, through GSV Asset, represented to Plaintiffs that Twitter had the right to control the sale of third-party restricted Twitter stock to induce Plaintiffs to sell the Twitter stock, but that Twitter never intended to go through with the sale of the third-party Twitter shareholders' stock. The FAC alleges that Twitter was both testing and priming the pre-IPO market for the planned IPO of Twitter Treasury stock, in order to support a $10 billion dollar plus valuation for Twitter. Twitter is a company that did not have any earnings or profits whatsoever from inception of its business and therefore was unable to use conventional methods of valuation to support its valuation.   Twitter had an Investor Relations Department that handled all of the Twitter market and investor communications for Twitter.   It is incredulous to claim that Twitter was not aware of the extensive European and Asian road show presentations made by Continental, with GSV Asset, to leading worldwide institutions, or the FINRA broker presentations that were held in New York and Arizona by Precedo Capital.   The presentations included revenue and sales projections that Twitter would most certainly have objected to, if GSV Asset were not authorized to present at the road shows.

The signing of Mandate Agreements with GSV Asset and Plaintiffs to sell the Twitter Third Party shareholder stock is further support for Plaintiffs reasonable belief that GSV Asset was acting for Twitter since the agreements were prepared by GSV Asset's attorneys, Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini"), the same Wilson Sonsini that represented Twitter in its IPO filing with the Securities and Exchange Commission ("SEC").

There is a reasonable inference that the same attorney firm would not represent both Twitter and GSV Asset unless GSV Asset had the authorization to represent Twitter in the sale of third-party Twitter stock.

Twitter's actions and misrepresentations were not only directed toward Plaintiffs, institutions, and brokerage firms, but ultimately toward the trading public market and public stockholders that purchased Twitter shares both in the IPO and at various prices in the trading after market, by Twitter's intentionally testing and priming the market for Twitter stock.

Plaintiffs have sufficiently alleged Twitter's misrepresentations in its FAC, which specifically recites statements, dates, and actions of GSV Asset, as agent for Twitter, all of which were reasonably relied upon by Plaintiffs in offering third-party Twitter stock for sale.  Twitter's ostensible actions, inactions, and statements, as alleged in the FAC regarding the agency relationship with GSV Asset give rise to the plausibility that led Plaintiffs to the conclusion that Twitter held out GSV Asset to act as its agent for the sale of Twitter stock, and that when Twitter cancelled the offering after two postponements, that Twitter never intended to sell the restricted stock, but to support a huge market valuation and, ultimately, deceive the Plaintiffs, institutional buyers and FINRA brokers, as well as the public.

## STATEMENT OF FACTS

Plaintiffs have alleged an agency relationship between Twitter and GSV Asset through Twitter's affirmative conduct and omissions.  Twitter used the same attorneys as GSV Asset in all transactions dealing with the sale of Twitter shareholder stock; "Wilson Sonsini represented both GSV Asset and Twitter" SAC ¶¶ 51, 73, implying that GSV Asset was authorized by Twitter to enter into the transactions.  "Moe presented various documents, prepared by Wilson Sonsini, Counsel for both Twitter and GSV Asset, to the investors at the presentation."  SAC ¶

51.   Twitter also provided a shareholder list of third party shareholder stock to be sold and confidential Twitter disclosure information to induce Plaintiffs into believing that GSV Asset was Twitter's agent and that Twitter wished to sell third party shareholder stock.   "Twitter was aware and intentionally provided to GSV Asset the shareholder list of some of the shares to be sold as well as all of the presentation materials, which consisted of Twitter financial and revenue projections."  SAC ¶ 41.  No party other than Twitter could have provided this list.

In addition, Twitter told investors that they were aware of the GSV Asset fund and the presentations and offering GSV Asset was conducting, thereby authorizing GSV Asset as its agent.   "Twitter, through Erdmann, further represented that they were aware of the GSV presentations, and that GSV has been promoting the Third-Party shareholder Twitter stock" SAC ¶ 34 and that Twitter was "aware that GSV was marketing a Twitter fund." SAC ¶ 37.  Twitter would not recognize and claim they were aware of the GSV Asset offering unless they had clearly authorized GSV Asset to offer the Third Party shareholder stock.

Moreover, Twitter had knowledge that GSV Asset entered into the Mandate agreements with Plaintiffs to sell Twitter shareholders stock.  Twitter's failure to prevent the transactions clearly implies that Twitter authorized GSV Asset to enter into the agreements.   "Twitter knew in February 2012 that for GSV Asset to resell the Twitter stock, Twitter had to authorize GSV Asset to enter into Mandate Agreements with financial advisory firms or licensed broker dealers, to solicit and sell Twitter stock to accredited investors through such a vehicle." SAC ¶ 6.

Plaintiffs have alleged with particularity, that Twitter committed common law fraud against Plaintiffs.  "Twitter, through GSV Asset, fraudulently misrepresented that the reason for selling the stockholder shares of stock was to assure that there would not be a market overhang of Twitter stock following an IPO by Twitter."   SAC ¶ 12.  "Twitter, through GSV Asset,

4

represented to Plaintiffs that Twitter desired to sell $278,000,000 worth of Twitter stock owned by Twitter stockholders and not Twitter. The entire time Twitter made this representation to Plaintiffs through GSV Asset, Twitter knew it to be false. Twitter never intended to sell the shareholder's stock." SAC ¶15.

Twitter's false representations were made numerous times, by statements from Hanson, an officer of GSV Asset and through Twitter's conduct. "Twitter, through its agent GSV Asset, represented to Precedo Capital that it wanted to sell Third-Party shareholder Twitter stock and that GSV Asset was directly authorized by Twitter to offer up to 18 million secondary shares of Twitter stock and that GSV had the exclusive right." SAC ¶48. This representation was made numerous times to Precedo Capital, namely at the "Citibank presentation in April of 2012 and the Hightower presentation on April 18, 2012. Other presentations where the representation was made include Newbridge Securities, Merrill Lynch and Deutsche Bank in May of 2012 and Still Point Capital and Ocean Securities in June of 2012." SAC ¶48. Twitter made similar representations to Continental Advisors. "Twitter, through its agent GSV Asset, represented to Continental Advisors that it wanted to sell Third-Party shareholder Twitter stock, and that it had the exclusive right to do so. In addition to stating that Twitter wished to sell Third-Party shareholder Twitter stock, after every road show presentation, Twitter, through Hanson stated "Twitter only has 9 Approved buyers of their stock. GSV Asset is one of them and has been for over two years. GSV is the only one of the approved buyers to currently have an allocation of stock to sell."" SAC ¶52. This representation was made at every European presentation, namely "The European road shows began with Moran and MP in Milan, Italy on September 7, 2012, and on September 10, 2012 in Milan, Italy and Lugano, Switzerland. They continued on to Luxembourg on September 11 and 13 of 2012 and September 21, 2012. Hanson did the road

show in Geneva, Switzerland on September 12, 2012.  MP and Hanson went on to Zurich, Switzerland road shows on September 13, 2012 and back on September 21, 2012.  The Paris, France road shows were on September 14, 2012 and September 20, 2012.  The London, England road show on September 19, 2012.  The Singapore road shows on September 24, 2012 and September 25, 2012.  The Brussels, Belgium road show on September 17, 2014.  The Stockholm, Sweden road show on September 18, 2012 and the Luxembourg road show on September 9, 2012." SAC ¶54.

Moreover, Plaintiffs alleged that Twitter knew this representation was false.  "Twitter never intended to go through with the deal.  Twitter knew that their representation was false, as they never intended to sell the Third-Party shareholder stock.  First, Twitter told GSV Asset that it had the only share allocation and right of first refusal regarding the Third-Party shareholder's Twitter stock.  This was a lie as Erdmann confirmed to Schnieder that it was aware of both GSV Asset's presentations and 1Oak's presentations.  SAC ¶ 59

"Moreover, Twitter never represented to GSV Asset that the Third-Party Shareholder stock was highly restricted.  Rather, it was represented that the shareholders were going to sell the stock into @GSV.  However, Plaintiffs learned after Twitter filed its IPO that the stock was highly restrictive, and the shareholders could not sell their shares of stock.  Further, even if Twitter permitted the sale of the stock there was no guarantee the shareholders would sell." SAC ¶ 60

Both Plaintiffs reasonably relied on Twitter's misrepresentations.  "Precedo Capital reasonably believed and relied upon the premises that Twitter wished to sell the stockholder's stock based upon that representation by Twitter through GSV Asset" SAC ¶ 65 "Continental Advisors, relied upon the representations that GSV Asset had Twitter's authorization to resell

Twitter shares at or around $19 per share, and the fact that Twitter provided a substantial amount of non-public information at the road shows and presentations, including a shareholder list which could only be compiled and maintained by Twitter." SAC ¶ 45

Finally, Plaintiffs have alleged compensable damages. "Precedo Capital lost the… sum of $2,156,063 plus "Carry" and $229,806.45 of marketing, legal, and travel, and other out of pocket expenses which were expended by Precedo Capital on reliance of the Twitter misrepresentations made through GSV Asset and Hanson." SAC ¶ 86. Further, Continental Advisors lost up to $22,077,500 of total compensation…Continental had borne all out-of-pocket expenses for a total of $348,000 out of pocket expenses upon reliance on the misrepresentations made by Twitter through GSV Asset and Hanson. SAC ¶ 87.

## ARGUMENT

## I.   LEGAL STANDARD

### A.   Rule 12(b)(6)

"In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court "must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor."" *Rosenblum v. Thomson Reuters (Markets) LLC*, 2013 WL 5780775 (S.D.N.Y. 2013) (Scheindlin, J.) quoting *Simms v. City of New York,* 480 Fed. App'x 627, 629 (2d Cir.2012) (citing *Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008)) "A claim should not be dismissed if the plaintiff has stated facts sufficient to state a claim to relief that is plausible on its face." *Id* . (internal quotation marks omitted) "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* citing *Aschcroft v.Iqbal,* 556 U.S. 662, 678 (2009) "Plausibility

"is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."" *Id.* (internal quotation marks omitted)

### B.    Rule 9(b)

"Rule 9(b) requires that 'circumstances constituting fraud ... be stated with particularity." *Rey-Willis v. Citibank, N.A.*, 2003 WL 21714947 (S.D.N.Y. 2003)(Scheindlin, J.) citing *Wight v. Bankamerica Corp.,* 219 F.3d 79 (2d Cir.2000) (quoting Fed.R.Civ.P. 9(b)). The Second Circuit has construed Rule 9(b) to require a complaint alleging fraud to "allege the time, place, speaker and sometimes even the content of the alleged misrepresentation." *Id.* citing *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990) (citations omitted).  "Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Plaintiffs do not need to "plead dates, times and places with absolute precision, so long as the Complaint gives fair and reasonable notice to defendants of the claim and grounds upon which it is based." *International Motor Sports Group, Inc. v. Gordon*, No. 98-5611, 1999 U.S. Dist. LEXIS 12610 at 11. Moreover, "it is particularly appropriate to ease the pleading burden under Rule 9(b) when information is within the exclusive control of the defendant."  *ABF Capital Mgmt v. Askin Capital Mgmt, L.P.,* 957 F.Supp. 1308, 1327 (S.D.N.Y. 1997)

### C.    Agency

A principal/agent relationship can be established either expressly or impliedly.  *See Property Advisory Group, Inc. v. Bevona*, 718 F.Supp. 209, 211 (S.D.N.Y. 1989)  "An implied agency is inferred from the facts and circumstances of the particular case, including the words and conduct of the parties."  *Id.*  Although apparent authority of an agent to act on behalf of a principal may be communicated by words or conduct of the principal to a third party, wherein there is a reasonable basis for the third party to believe the agent has the authority to act on

behalf of the principal, "apparent authority may arise absent any direct contact between the principal and the third party." *Id.* "Apparent authority is conferred by the conduct of a principal which justifies a third party's belief that an agency relationship exists. *Id.* citing *E.F. Hutton & Co. v. First Florida Securities, Inc.,* 654 F.Supp. 1132, 1142 (S.D.N.Y 1987).

Moreover, even if a purported agent lacks actual authority, a principal is nonetheless liable "if it ratified the illegal acts." *In re South African Apartheid Litigation*, 633 F.Supp.2d 117, 122 (S.D.N.Y. 2009) (Scheindlin, J.) citing *Phelan v. Local 305 of the United Ass'n of Journeymen,* 973 F.2d 1050, 1062 (2d Cir.1992). "The acts of an agent are imputed to the principal "if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself."" *Id.* citing *Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936). "Even mere acquiescence is sufficient to infer adoption of wrongdoing." *Id. See In re Bennett Funding Group,* 336 F.3d 94, 101 (2d Cir.2003). "Ratification also may be found to exist by implication from a principal's failure to dissent within a reasonable time after learning what had been done." *Id.* citing *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.,* 26 F.3d 370, 375 (2d Cir.1994).

Finally, a Court must look towards the standard practice of business within a particular industry to determine the extent of a principal/ agent relationship when dealing with apparent authority.

> "Where a principal…placed an agency in such a situation that a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption, the principal is estopped as against such third person from denying the agent's authority." *See Property Advisory Group, Inc. v. Bevona*, 718 F.Supp. 209, 211 (S.D.N.Y. 1989) citing 2 N.Y.Jur.2d Agency § 89.

"To determine the extent of an authorization, a court must look to the accompanying circumstances, including the situation of the parties, their relationship to each other and the business in which they are engaged, the general usages of the business in question and the purported principal's business methods." *Id.* citing *Columbia Broadcast Systems Inc. v. Stokely – Van Camp Inc.*, 522 F.2d 369, 375-76 (2d Cir. 1975).

> ### D.   Fraud

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *In re Optimal U.S. Litigation*, 837 F.Supp.2d 244, 252 (S.D.N.Y. 2011)(Scheindlin, J.) (internal quotations omitted)

## II.   TWITTER, THROUGH THEIR CONDUCT AND OMISSIONS, ARE LIABLE FOR STATEMENTS MADE BY GSV ASSET

As alleged throughout the SAC, Twitter authorized GSV Asset to act as its agent. Twitter authorized GSV Asset to act as its agent through its actions and omissions while the sale of Twitter shareholders' stock was being promoted all over the United States and in Europe in various road shows.  Twitter did not need to expressly state that they authorized GSV Asset to act as its agent.  *See Property Advisory Group* at *211.  Twitter's conduct and omissions were such that a reasonable person would plausibly believe that Twitter was entirely in control of the deal and that GSV Asset had full authority to act on behalf of Twitter.  Moreover, the standard practice of business within the particular industry was such that the Plaintiffs would never have contact with Twitter regarding the transactions.  Plaintiffs dealt only with Twitter's agent, GSV Asset, which complies with the standard practice of the industry.

Rather than expressly authorizing GSV Asset to act as its agent, Twitter impliedly authorized GSV Asset by (1) using the same attorneys, namely Wilson Sonsini, to prepare all legal documents in connection with the sale of Twitter's shareholders' stock; (2) providing a shareholder list of Twitter stockholders which could only be provided by Twitter; and (3) providing confidential disclosure materials, namely financial and statistical projections of the company which would ultimately be used in Twitter's IPO.  These three actions by Twitter gave Plaintiffs the reasonable belief that Twitter authorized GSV Asset to act as its agent.

Moreover, Twitter did not contact GSV Asset and demand that they cease selling Twitter's shareholders' stock even after months of GSV Asset and Plaintiffs promoting Twitter's shareholder's stock all over the world.  As alleged in the SAC, Twitter was fully aware that GSV Asset had a Twitter Fund wherein institutional investors could purchase into to buy Twitter shareholder stock, and that GSV Asset was using Plaintiffs to promote the fund.  Even though Twitter was aware of GSV Asset and Plaintiff's actions, Twitter failed to demand that GSV Asset stop attending road shows on behalf of Twitter after being contacted by numerous interested investors, who learned of the sale of Twitter's shareholders' stock through Plaintiffs' road shows.  Twitter's failure to take action ratifies and constitutes GSV Asset's apparent authority to act as Twitter's agent in the eyes of the law.  *See Property Advisory Group, Inc.* at *211.

A.    **Twitter's Conduct Gave Rise to a Plausible Inference that Twitter Authorized GSV Asset to Act as its Agent**

1.    ***Twitter appeared to be in total control of the sale of Twitter shareholder's stock by using the same attorneys as GSV Asset in all transactions.***

Plaintiffs reasonably believed that GSV Asset was Twitter's agent through the actions of Wilson Sonsini and the type of work that was done on behalf of GSV Asset for the benefit of

Twitter.  Wilson Sonsini, who has been Twitter's counsel prior to Twitter's IPO through the present day, is well versed in all Twitter transactions.  The fact that GSV Asset used the same attorneys to prepare all documents in connection with selling Twitter stock, plausibly infers that Twitter authorized GSV Asset to act as its agent.

Twitter wanted their attorneys, Wilson Sonsini, to be in control of all legal documentation regarding Twitter stock.  Therefore, Wilson Sonsini prepared all the documents (namely the Mandate Agreements) that Plaintiffs were required to enter into prior to promoting the Twitter Stock.  It is implausible to think that Wilson Sonsini, who was representing Twitter, would not disclose to Twitter that another party was planning on selling Twitter Third Party shareholder's stock.  This would clearly be a violation of Wilson Sonsini's fiduciary obligation to Twitter.  However, as Twitter authorized GSV Asset to act as its agent, Wilson Sonsini could draft all legal documentation and work on the GSV Asset transactions for the benefit of Twitter.

Plaintiffs reasonably believed that GSV Asset was Twitter's agent because of the fact that Wilson Sonsini represented both parties.  "Apparent authority is conferred by the conduct of a principal which justifies a third party's belief that an agency relationship exists."  *See Property Advisory Group* at *211.  The appearance was that Twitter wanted to control all dealings with the Twitter shareholder stock and therefore required GSV Asset to use Wilson Sonsini going forward with any transactions.  Twitter was able to monitor all transactions through their counsel as was the purpose.  Plaintiffs have clearly alleged plausible claims against Twitter.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Rosenblum v. Thomson Reuters (Markets) LLC*, 2013 WL 5780775 (S.D.N.Y. 2013) (Scheindlin, J.)

      **2.**     ***Twitter provided a Shareholders list of stock to be sold, which could only be provided by Twitter.***

The shareholder list provided by Twitter further indicates Twitter and GSV Asset's agency relationship. The shareholder list, which was comprised of over thirty shareholders of Twitter stock, provided the amount of stock owned with a very low basis. When GSV Asset provided Mark Porcelli of Continental Advisors with a copy, the names were all blocked out and Porcelli was not permitted to copy or distribute the list, further indicating that Twitter only wanted its Agent, GSV Asset, to have access of the list. See ¶ 30 of the SAC.

Defendants go to great lengths to argue in their MOL that other parties could have obtained the shareholder list, but give absolutely no basis for their argument. The shareholder list consisted of Twitter stockholders. Twitter, at that time was a private company and did not disclose any information regarding Twitter shareholders. Nor did Defendants attach any meritorious affidavit by Defendants claiming that Twitter was not the only party with access to the shareholder list, or that Twitter in fact provided said list to all shareholders. It is plausible that since GSV Asset had access to this list, which no other entity or individual had, GSV Asset was authorized by Twitter to show the list. Moreover, the fact that GSV Asset did not permit Plaintiffs to copy or distribute the list shows that Twitter did not want anyone other than GSV Asset to have access to the list.

Defendants attempt to argue that the Third Party shareholder list is meaningless. However, Twitter's fraud revolved around selling the stock of those specific shareholders on the list. Twitter provided GSV Asset with the list to induce Plaintiffs into believing there were actual shares which Twitter wanted to sell to avoid the same problems Facebook faced during their IPO. When Plaintiffs saw that GSV Asset had access to Twitter's shareholder list, they reasonably believed that Twitter authorized GSV Asset to act as its agent, despite Defendant's attempts to minimize the significance of the shareholder list.

13

3. *Twitter provided confidential company information to GSV Asset to use for the promotion of Twitter shareholders' stock.*

Twitter provided GSV Asset with confidential Twitter information, including financial and statistical projections of Twitter stock going forward. As alleged in paragraphs 24-29 of the SAC, Twitter offered an abundance of confidential Twitter information wherein over Forty (40) slides were composed to induce accredited investors to purchase the Twitter shareholders' stock.

Defendant completely fails to mention, in its MOL, the specific allegations depicting certain slides of information provided by Twitter. Paragraphs 24-29 of the SAC allege detailed and specific information regarding highly confidential Twitter information. As Twitter was a private company with no disclosure materials at the time these presentations were underway, it is highly unlikely that a third party, other than Twitter, could have provided information alleged in the SAC. In fact, it is extremely plausible that the only company who could have provided such information was Twitter.

Plaintiffs reasonably believed that the information provided by GSV Asset had originally been produced by Twitter. The confidential nature of the information tied in with GSV Asset's representations that the material was provided by Twitter makes it absolutely plausible for Plaintiffs to have believed the information was provided by Twitter. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Rosenblum v. Thomson Reuters (Markets) LLC*, 2013 WL 5780775 (S.D.N.Y. 2013) (Scheindlin, J.)

B. **Twitter, Through its Omissions, Gave Rise to a Plausible Inference that GSV Asset was its Agent**

Twitter gave the appearance that it authorized GSV Asset to act as its agent not only through its affirmative action's, but through its inactions. Twitter acknowledged that it was

14

aware of the GSV Asset fund and the presentations that were taking place.  Even after being contacted by accredited investors, Twitter did not contact GSV Asset and require them to stop offering the Twitter stock.  Moreover, Twitter knew that GSV Asset was entering into Mandate Agreements with Plaintiffs to sell Twitter stockholders' shares as their counsel drafted all the legal documents.  Twitter did not demand that GSV Asset refrain from entering into these agreements.  Finally, Twitter never demanded that GSV Asset not accompany Plaintiffs to sell the Twitter stockholder's shares.  All of Twitter's inactions give rise to a plausible claim that Twitter ratified GSV Assets actions and therefore cannot be estopped from liability. "Ratification also may be found to exist by implication from a principal's failure to dissent within a reasonable time after learning what had been done." *In re South African Apartheid Litigation*, 633 F.Supp.2d 117, 122 (S.D.N.Y. 2009) (Scheindlin, J.)

        **1.**       ***Twitter acknowledged the GSV Asset Fund and failed to contact GSV Asset and demand GSV Asset to stop promoting the stock even after Twitter Investor Relations were contacted by potential buyers.***

Throughout the promotion of Twitter shareholders' stock numerous potential investors contacted Twitter's investor relations department and inquired about GSV Asset's ability to promote and bind the sale of Twitter stockholder's shares.  As alleged in ¶¶ 34-37 of the SAC, two different fund managers, Edward Schneider of Quan Funds and Laurent Sciboz, of Huet & Cie, both were on a telephone conference with Nils Erdmann ("Erdmann") the head of Twitter Investor Relations, Corporate Finance and Merger & Acquisitions for Twitter.  Twitter did not deny that GSV Asset was authorized to act as its agent.  In fact, Erdmann confirmed that Twitter was aware of the GSV presentation. (SAC ¶ 37)  Regardless of how Defendant tries to minimize this phone conversation, Twitter, by acknowledging that there was a GSV Asset marketing fund, provides proof that Twitter had authorized GSV Asset to promote the Twitter stockholder's

shares.  Had Twitter not authorized GSV Asset, Erdmann would have said that he was unaware of GSV Asset or that GSV Asset was not authorized to market a Twitter fund.  Erdmann did neither and therefore it is absolutely plausible to infer that Twitter authorized GSV Asset.

Moreover, Twitter had more than enough time to contact GSV Asset and demand ceasing all activities if Twitter really did not authorize GSV Asset to enter agreements with Plaintiffs or promote and sell the Twitter stockholder's shares.  However, Twitter failed to do so and the most plausible justification for this is because Twitter authorized GSV Asset to act as its agent.  "Apparent authority is conferred by the conduct of a principal which justifies a third party's belief that an agency relationship exists." *Property Advisory Group* at *211.  Plaintiffs reasonably believed that GSV Asset was Twitter's agent through Twitter's affirmative conduct, as well as the inaction by Twitter for months, even after learning the events from other parties.

### 2. *Twitter never demanded that GSV Asset stop promoting the stock with Plaintiffs after months of road shows.*

Twitter has prided itself on being in full control of all its private dealings and being fully aware of the ownership of all of its shares.  It defies logic to believe that Twitter was not aware that GSV Asset, who was one of Twitter's approved buyers, would be unaware of all transactions taking place with Twitter's stockholders' shares.  GSV Asset didn't attend small road shows and offer insignificant amount of shares of Twitter stock.  Rather, Twitter authorized GSV Asset to sell over $278,000,000 dollars worth of Twitter shareholder's stock.

GSV Asset accompanied Plaintiffs on numerous telephone conferences and road shows to promote the sale of Twitter stock, months before the transactions were ultimately cancelled by Twitter.  Twitter prided itself on being on top of the market ownership of its' stock and clearly knew of the promotion by GSV Asset, as was pleaded in the SAC ¶¶ 34-37, by representations of Twitter's head of Investor Relations, Nils Erdmann.  Therefore, Twitter, by not demanding that

GSV Asset stop promoting the sale of Third Party Twitter shareholder stock authorized and ratified GSV Asset to deal with and promote the sale of stock by Plaintiffs.

3.    *Twitter did not prevent GSV Asset from entering into Mandate Agreements regarding Twitter shareholder stock.*

Twitter was clearly aware of the Mandate Agreements that GSV Asset and Plaintiffs entered into as alleged in the SAC.  (See SAC ¶¶ 9, 44)  Wilson Sonsini, who was Twitter's attorneys, drafted the agreements and even negotiated the compensation terms in the agreements with representative for Plaintiffs.  It is absurd to argue, and Defendant does not do so in their MOL, that Twitter was unaware of the agreements.

Twitter authorized GSV Asset to enter into the mandate agreements as Twitter knew of the agreements and did not prevent GSV Asset from entering into them nor contact Plaintiffs and claim that the mandate agreements were null and void.  "Even mere acquiescence is sufficient to infer adoption of wrongdoing." *In re South African Apartheid Litigation*, 633 F.Supp.2d 117, 122 (S.D.N.Y. 2009) (Scheindlin, J.)  Twitter did absolutely nothing to indicate they did not authorize the Mandate Agreements and therefore Plaintiffs reasonably believed that GSV Asset was acting as Twitter's agent.

C.    **It is Not the Standard Practice of Business in the Securities Industry for Plaintiffs to Have Directly Contacted Defendant with Regard to the Transactions.**

Defendant, in its MOL, goes to great lengths to argue that Plaintiffs never once spoke with Twitter, and therefore Plaintiffs should not have reasonably believed that there was a principal/agent relationship between Twitter and GSV Asset.  Defendant is simply incorrect with their assessment of the law and the facts within the case.

First, Plaintiffs did not have to be in direct contact with Twitter to learn of the principal/agent relationship.  In fact, case law is clear that "wherein there is a reasonable basis

for the third party to believe the agent has the authority to act on behalf of the principal, "apparent authority may arise absent any direct contact between the principal and the third party."" *Property Advisory Group* at *211.  Clearly, as described above, there was a reasonable basis for Plaintiffs to believe that GSV Asset had the authority to act on behalf of Twitter.

Secondly, as alleged in the SAC ¶ 9 "it is standard practice in the securities industry to deal directly with the lead underwriter and seller of securities" so that Plaintiffs would only have had contact with GSV Asset and not Twitter.  Plaintiffs only worked with GSV Asset, the lead manager and Twitter's agent.  As this is the custom in the industry Plaintiffs were "justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption" *See  Property Advisory Group* at *211.

Plaintiffs have done numerous fund raising and sales of securities both pre and post IPO's solely on the representations by an agent as that is the custom in the business.  Additionally, the specific facts in this case lead to more information than is usually provided by the issuer, namely the fact that they had the same attorneys, the confidential financial and business information provided, and Twitter's inaction, even after representing to investors that it was aware of the GSV Twitter offering, provided a reasonable basis that GSV Asset was authorized to act as Twitter's agent.  "To determine the extent of an authorization, a court must look to the accompanying circumstances, including the situation of the parties, their relationship to each other and the business in which they are engaged, [and] the general usages of the business in question." See *Property Advisory Group* at *211.

Despite Defendant's continued argument that Plaintiffs never spoke with Twitter directly, Plaintiffs have alleged a plausible claim of fraud against Twitter based on agency theory,

wherein, GSV Asset was clearly authorized to act as Twitter's agent and any representations made by GSV Asset should be imputed to Twitter.

## III.   PLAINTIFFS HAVE ALLEGED FRAUD WITH PARTICULARITY

Plaintiffs have specifically pled fraud against Twitter with the requisite particularity under Rule 9(b). Defendant attempts to muddy the waters by claiming that Plaintiffs allegations are "vague, contradictory and incomprehensible" (MOL p. 16). However, the law is clear; Plaintiffs do not need to "plead dates, times and places with absolute precision, so long as the Complaint gives fair and reasonable notice to defendants of the claim and grounds upon which it is based." *See International Motor Sports Group, Inc.* at 11. Defendant themselves agree with this position that Rule 9(b) is "designed to provide a defendant with fair notice of a Plaintiff's claim" (MOL p. 16)(citing *Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 Fed. App'x 744 (2d Cir. 2009). Plaintiffs go well beyond giving fair notice to Defendant by alleging the dates and times the content of the fraudulent representation made by Twitter through GSV Asset. Additionally, Plaintiffs have listed every presentation wherein Twitter, through GSV Asset, represented to Plaintiffs, and all other parties attending the road shows that Twitter wished to sell third-party shareholder stock. Moreover, Plaintiffs allege with particularity the specific misrepresentations Twitter made knowing it to be false simply to induce plaintiffs to act, causing Plaintiffs' justifiable reliance on those misrepresentations and Plaintiffs damages.

### A.   Plaintiffs Have Pled Twitter's Misrepresentations with Particularity

Plaintiffs have alleged Fraud with particularity as is required under Rule 9(b). As shown above, Twitter through its actions and omissions clearly authorized GSV Asset to act as its agent. Therefore, the statements allegedly made by GSV Asset were, in fact, made by Twitter.

Defendant argues that not one misstatement was alleged that meets Rule 9(b)'s standard. A reading of the SAC indicates otherwise. Although Rule 9(b) requires that Plaintiff "allege the time, place, speaker and sometimes even the content of the alleged misrepresentation" (*Rey-Willis*) a Complaint need not "plead dates, times and places with absolute precision, so long as the Complaint gives fair and reasonable notice to defendants of the claim and grounds upon which it is based." *International Motor Sports Group* at *11.

Plaintiffs have alleged that Twitter, through GSV Asset, fraudulently represented "that the reason for selling the stockholder shares of stock was to assure that there would not be a market overhang of Twitter stock following an IPO by Twitter." (SAC ¶ 6). This one particular statement, as alleged, was Twitter's intent to defraud and was the basis for Plaintiffs to enter into transactions with GSV Asset. Twitter instead only wished to increase the value of the stock, by creating a private market price to be used as an enhanced valuation in a future IPO, without having a traditional method of valuation. (SAC ¶ 11) Plaintiffs have alleged numerous dates where Twitter, through Hanson, represented to Plaintiffs, and other individuals and companies present that GSV Asset had the authority to represent a group of Third Party Twitter shareholders and that Twitter would allow the shareholder transactions and that Twitter wished to sell these shareholders stock. (SAC ¶¶ 48, 52-54) The dates wherein this fraudulent statement was made are listed in the foregoing paragraphs. Moreover, on August 10, 2012, it was represented to Plaintiffs, by Matt Hanson, a member of GSV Asset, that Twitter approved all transactions going forward with selling Twitter shareholder stock. (SAC ¶ 31). Moreover, on September 4, 2012, Andreea Porcelli ("AP") was contacted by Hanson, after a phone conference was held on September 3, 2012. Hanson advised AP that any interested investors could contact Twitter's Investor Relations and ask about the "sale of stock" (SAC ¶ 32) Plaintiffs have

alleged the misrepresentations made by Twitter, through GSV Asset, with particularity and therefore Defendant's motion should be denied.[1]

The SAC also alleges Twitter's fraudulent conduct with particularity that induced Plaintiffs to offer and sell the Twitter shareholder stock. The SAC alleges that on September 12, 2012, GSV Asset was authorized to show Plaintiffs a shareholder list, of the stock that was to be sold in the transactions.  The list was provided by Hanson of GSV.  (SAC ¶ 30).  Moreover Defendant provided an abundance of confidential information (enough to fill over 49 power point slides), which was provided to induce Plaintiffs in promoting the shareholder's stock. (SAC ¶¶ 24-29).  In providing this information Twitter was implying to Plaintiffs that it wished to sell and promote the shareholder's stock.

The statements, conduct and failure to act by Twitter induced Plaintiffs in believing that Twitter truly wished and intended to sell the Third Party Twitter shareholder's stock.  Plaintiffs have alleged "exactly what [defendant] said, when he said it and to whom he said it" (*Kolbeck v. LIT Am, Inc.*, 923 F.Supp. 557, 568 (S.D.N.Y. 1996)) while also alleging conduct Twitter engaged in to defraud Plaintiffs and therefore the motion should be denied.

B.    **Plaintiffs Allege Particular Facts Depicting the Falsity of Twitter's Misstatements.**

Defendant maintains that Plaintiffs' allegations are speculative and conclusory.  To the contrary, Plaintiffs have alleged specific facts indicating how Twitter never intended to go through with the sale of Twitter shareholder stock even though Twitter maintained they wanted to sell the stock, while using GSV Asset and Plaintiffs to further its plan to both prime the market and support an unsupported valuation for its future IPO.  Defendant claims that the only

---

[1] Plaintiffs have clearly alleged the other elements of Common Law Fraud, namely Defendant's intention of inducing reliance and how the misrepresentation prejudiced the Plaintiffs.  See SAC ¶¶ 48-88.  It is important to note Defendant does not raise any arguments to the contrary.

fact Plaintiffs' cite was that the transactions never occurred.  It is true that the transactions never occurred.  However, Plaintiffs have also alleged that Twitter lied regarding which company had the share allocation and right of first refusal. (SAC ¶59) Moreover, Twitter Third Party shareholder's stock was highly restricted, a fact that Plaintiffs did not know at the time they justifiably relied upon Twitter's misrepresentations.  (SAC ¶60)  Neither Twitter nor the shareholders could have sold or pledged the stock as it was restricted, a fact that was not disclosed to Plaintiffs prior to engaging in the various road shows and presentations.

Plaintiffs have alleged that they were unaware that Twitter had full control of the shares as they were restricted, until after the IPO was filed.  (SAC ¶ 60) Since Plaintiffs were unaware that the stock was restricted, they justifiably relied on the representation that Twitter wished to sell the stock and avoid a market overhang, similar to what happened after the Facebook IPO. (See SAC ¶¶ 6,11)  However, Twitter knew that the stock was restricted, and that the sale was never going to be completed.  As opposed to what Defendant has claimed in its MOL, Plaintiffs did not learn this because the transactions weren't completed, but because Plaintiffs later learned that the stock was restricted and Twitter could not have sold the shares even if they wanted to. Twitter's misrepresentation caused Plaintiffs' damages and therefore the motion should be denied.

### C.      Plaintiffs Alleged Defendant's Fraudulent Intent

Courts have held that when pleading intent "Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  *International Motor Sports Group, Inc.* at 11.  That is because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind."  *Chill v. Gen Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) citing *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987).

22

Plaintiffs have alleged Twitter's fraudulent intent despite Defendant's claim that the SAC lacks allegations stating a motive to commit fraud.[2]   Plaintiffs have alleged that Twitter ultimately wished to value its company by creating a high market floor price valuation prior to filing their IPO. (SAC ¶¶ 8,11,15)  This was important for Twitter because it would never have been able to value the company at a minimum of 10 Billion dollars through traditional valuation methods.  (SAC ¶¶ 14,24,71)  Twitter lacked the requisite sales and financial performance that would value their company at such a high pre IPO valuation.  Twitter's fraudulent motive was to prime the market through private transactions to give the impression and to increase interest in Twitter stock to create an explosion of the market price during the IPO. (SAC ¶¶ 8, 11, 89)

Defendant instead tries to compare the facts of the *Chill* case, which is wholly inapposite to the allegations in the SAC.  In *Chill*, Defendant was already a public company whose subsidiary committed a fraud within the company.  The Company took a loss, and shareholders sued for "materially false and misleading press releases and financial statements" under Section 10(b) under the Securities Exchange Act.  *Chill* at *266.

Unlike *Chill*, Twitter misrepresented to Plaintiffs that they wished to sell the Third Party Twitter shareholder's stock to induce Plaintiffs to promote Twitter stock and to avoid an overhang of Twitter shares by shareholders who owned low basis twitter stock.  However, Twitter's intention was to use Plaintiffs to create a market floor price as a valuation even though they do not have traditional valuation methods.  As Twitter's motive of scienter has clearly been alleged, Defendant's motion should be denied.

---

[2] The Court should take Judicial Notice that Defendant has not argued that Plaintiffs have not alleged that Defendant had Opportunity to commit fraud.

**IV.    PLAINTIFFS HAVE PLED COMPENSABLE DAMAGES**

    **A.    PLAINTIFFS HAVE PLED ACTUAL AND CONSEQUENTIAL DAMAGES**

Defendant's assertion that Plaintiffs have not pled damages is blatantly wrong.  The SAC pleads actual, out of pocket damages for Precedo Capital in the amount of "$229,806.45 of marketing costs, legal, and travel, which were expended by Precedo Capital on reliance of the Twitter misrepresentations. (SAC ¶ 86).  Plaintiffs have further pled actual, out of pocket damages for Continental Advisors in the amount of $348,000.00 upon the reliance of the misrepresentations made by Twitter. (SAC ¶ 87)    In addition to these amounts, employee time and other overhead expenses connected to the offerings are to be determined at trial.  The above amounts meet the pleading requirements and resultantly Defendant's motion should be denied.

Moreover, Defendant's interpretation of the out-of-pocket rule is incorrect.  Under the *Lama Holding* case the out-of-pocket rule is defined as "the loss is computed by ascertaining the "difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain" *Lama Holding Co. v Smith Barney Inc.*, 88 N.Y.2d 413 (N.Y.1996) citing (*Sager v Friedman*, 270 NY 472, 481). This suggests that Plaintiffs are entitled to the amount they collected from selling the shares of stock minus the amount of money expanded in selling the shares.  As alleged in the SAC ¶¶ 85,86 and 87, Precedo lost over 3.8 million dollars, as the stock was already sold and committed to (money was deposited in escrow by investors SAC ¶ 62) and Continental lost $22,077,500, as they had indications of interest to purchase the stock by the investors and institutions as is custom in the securities industry. (SAC ¶ 62)  As these sales were confirmed by the deposits it is clear that the amounts of money lost by Plaintiffs are not "undeterminable and speculative" and therefore Defendant's motion should be denied.  *Id.* citing (*Dress Shirt Sales Inc., v Hotel*

*Martinique*, 12 NY2d 339, 344) Holding that "the loss of an alternative contractual bargain cannot serve as a basis for fraud or misrepresentation damages because the loss of the bargain was "undeterminable and speculative")

### B.    PLAINTIFFS HAVE PLED PUNITIVE DAMAGES

A plaintiff must plead the following elements to allege punitive damages: "(1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of the egregious nature set forth in *Walker v. Sheldon*...; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally.... *Baxter Diagnostics, Inc. v. Novatek Medical, Inc.*, 1998 WL 665138 (S.D.N.Y. 1998) (internal citations omitted)

Twitter has acknowledged that it does not meet any of the traditional criteria in meeting the standards utilized for valuation in an IPO.[3]   Therefore the private transactions, which were intended to prime the market, supported Twitter's successful efforts to value Twitter at 10 Billion dollars.  The private transactions set a floor at $19 per share, which Twitter then used to negotiate a higher IPO price.  They used this floor to convince underwriters to establish a higher market price.   These actions were wanton and egregious because at the time of Defendant's actions, it was uncertain as to whether their improper valuation would negatively affect the public who purchased in and after the IPO.  This conduct is punishable because of Twitter's wanton disregard of public disclosures to the investing public.

### CONCLUSION

For the foregoing reasons Defendant's motion should be denied in its entirety.

---

[3] The Court can take judicial notice of Twitter's Form S1 filing with the SEC.  *In re Fuwei Films Securities Litigation* 634 F.Supp2d 419, fn3 (S.D.N.Y. 2009)

Dated: New York, New York
      March 12, 2014

                                       Respectfully submitted,

                                       BARATTA, BARATTA & AIDALA, LLP
                                        /s/ Ottavio V. Mannarino
                                       Ottavio V. Mannarino
                                       546 Fifth Avenue, 6th Floor
                                       New York, NY 10036
                                       (212) 750-9700
                                       *Attorneys for Plaintiffs*