UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

PRECEDO CAPITAL GROUP INC.
and CONTINENTAL ADVISORS SA,

**Plaintiffs,**

- against -

TWITTER INC,

**Defendant.**

------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/21/14

<u>OPINION AND ORDER</u>

**13 Civ. 7678 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Plaintiffs, two financial services companies, bring this suit against Twitter Inc. for common law fraud.[1]  They claim that Twitter led them to believe that non-party GSV Asset Management Inc. ("GSV Asset") was its agent for the purpose of selling privately held Twitter stock.  As a result, plaintiffs entered into agreements with GSV Asset to promote a fund of Twitter stock.  However, Twitter canceled the stock sales.  Plaintiffs contend that Twitter never intended to permit the stock sales, and were only taking advantage of plaintiffs' marketing efforts to increase the company's value in advance of its planned initial public offering

---

[1]       Jurisdiction is premised on diversity of citizenship.

1

("IPO").

      Twitter moves to dismiss the complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, Twitter's motion is granted.

## II.   BACKGROUND

### A.   Facts[2]

#### 1.   The Parties

      Precedo Capital Group Inc. ("Precedo") and Continental Advisors SA ("Continental") are both in the financial services industry.[3]  Twitter is a social media network that was privately held from the time of its founding in 2006 until its IPO in November 2013.[4]

      The Complaint's allegations relate to events that began in early 2012

---

[2]    Unless otherwise indicated, the facts are drawn from the Second Amended Complaint ("Complaint").  Well-pleaded factual allegations are presumed true for the purposes of this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  However, allegations in the Complaint that consist of conclusory statements or threadbare recitals of causes of action are not entitled to the presumption of truth.  *See Kirkendall v. Halliburton*, 707 F.3d 173, 175 n.1 (2d Cir. 2013); *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 173 (2d Cir. 2012) (citing *Iqbal*, 556 U.S. at 678).

[3]    *See* Complaint ¶¶ 16, 17.

[4]    *See id.* ¶¶ 1, 2.

and ended in October 2012, a year before the IPO.[5]  During this time, plaintiffs never communicated directly with Twitter.[6]  Instead, they dealt with GSV Asset, believing GSV Asset to be Twitter's agent in connection with the sale of Twitter stock.[7]

### 2.  The Alleged Fraud

On an unspecified date, plaintiffs met GSV Asset's managing partner, Matthew Hanson.[8]  During this meeting, Hanson, or someone else, told plaintiffs that Twitter had authorized GSV Asset to create and manage a fund that would purchase shares of Twitter stock in private transactions.[9]  GSV Asset stated that Twitter wanted it to manage these positions in order to (1) "avoid one of the pitfalls of the Facebook IPO by removing an overhang of Twitter shares from the market;" (2) stabilize the market price of Twitter shares; and (3) provide support

---

[5]      *See id.* ¶¶ 7, 45, 51.

[6]      *See id.* ¶ 9 ("It is standard practice in the securities industry to deal directly with the lead underwriter and seller of securities, so that there was only communication with GSV Asset during the offering in which Plaintiffs relied on Twitter's representations through GSV Asset and not directly with Twitter.").

[7]      *See id.* ¶¶ 21-45.

[8]      *See id.* ¶ 5.

[9]      *See id.*

3

for a $10 billion valuation of Twitter before its IPO.[10]  At some point, Hanson also told plaintiffs that GSV Asset had a right of first refusal for a $278,000,000 block of third-party Twitter shares.[11]

Precedo entered into a Mandate Agreement with GSV Asset on May 6, 2012.[12]  Continental and GSV Asset executed a separate Mandate Agreement on August 20, 2012.[13]  Under the Mandate Agreements, plaintiffs would find investors for @GSV Fund LP ("@GSV") in exchange for fees or commissions.[14]  Believing that GSV Asset would be able to obtain Twitter's consent to acquisitions of Twitter stock, plaintiffs marketed @GSV both domestically and abroad.[15]

The Complaint alleges that Twitter never intended to consent to the sale of Twitter stock.[16]  Instead, "Twitter's intention . . . was to induce Precedo Capital and Continental Advisors to create an artificial private market for Twitter

---

[10]     *Id.* ¶ 6.

[11]     *See id.* ¶ 23.

[12]     *See id.* ¶ 44.

[13]     *See id.*

[14]     *See id.*  Precedo was to sell Twitter stock through a carve out of @GSV, as the Precedo Opportunity Fund.  *See id.*  Continental agreed "to sell @GSV which would hold 100% Twitter stock . . . ."  *Id.*

[15]     *See id.* ¶¶ 11, 43, 47-48, 52, 58, 65, 67-68.

[16]     *See id.* ¶ 11.

stock . . . at or about $19 per share . . . ."[17]  The Complaint further alleges that Twitter knew that plaintiffs "were in the process of obtaining investors to sell them Twitter stock, and that to withdraw the shares from the private market, both Continental [ ] and Precedo [ ] would sustain damages, as accredited buyers had already committed [to] the purchase of Twitter's stock."[18]

"Twitter cancelled the GSV Asset Offering on October 5, 2012.  GSV Asset then sent a formal letter of cancellation to [Continental] on October 22, 2012."[19]  By the time Twitter cancelled the GSV Asset offering on October 5, 2012, Continental alone had made arrangements for accredited foreign investors to purchase up to 11,395,000 shares of Twitter stock.[20]

### 3.    The Alleged Agency Relationship

The Complaint identifies several grounds for plaintiffs' belief that GSV Asset was Twitter's agent.[21]  *First*, GSV Asset used the law firm Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini"), which is also Twitter's counsel, to draft the @GSV term sheet, offering documentation, subscription and mandate

---

[17]    *Id.* ¶ 14.

[18]    *Id.* ¶ 13.

[19]    *Id.* ¶ 45.

[20]    *See id.*

[21]    *See id.* ¶ 21.

agreements, and other documents.[22]  *Second*, GSV Asset had access to what

plaintiffs believed was Twitter's highly confidential information, such as a

stockholder list and certain financial projections.[23]  Finally, GSV Asset represented

that Twitter said that GSV Asset was an approved buyer of Twitter stock.[24]

Beginning in April 2012, GSV Asset told Precedo that Twitter wanted

GSV Asset to sell third-party Twitter stock "and that GSV Asset was directly

authorized by Twitter to offer up to 18 million secondary shares of Twitter stock

and that GSV Asset had the exclusive right."[25]  "This representation was made at

every presentation that Precedo [ ] held[,]" including presentations to at least ten

financial institutions in five different states between April 2012 and June 2012.[26]

Precedo also used "confidential Twitter information" at the investor

presentations.[27]  At a presentation on April 18, 2012, "Moe," an officer of GSV

Asset, presented various documents prepared by Wilson Sonsini.[28]

---

[22]      *See id.* ¶¶ 22, 51.

[23]      *See, e.g.*, *id.* ¶¶ 24, 30.

[24]      *See, e.g.*, *id.* ¶¶ 42, 48.

[25]      *Id.* ¶ 48.

[26]      *Id.* ¶¶ 48, 49-51.

[27]      *Id.* ¶ 50.

[28]      *See id.* ¶ 51.

On August 10, 2012, Hanson told plaintiffs that the pre-IPO sale of Twitter shares was approved by Twitter, GSV Asset, and Wilson Sonsini.[29]  On August 22, 2012, Hanson told Continental and several institutional investors on a conference call that GSV Asset was one of nine approved buyers of Twitter stock.[30]  He also said that GSV Asset was the only approved buyer that currently had an allocation of stock to sell.[31]  Hanson repeated these representations on five conference calls held between August 23, 2012 and September 6, 2012.[32]

On September 4, 2012, Hanson sent an email to Mark Porcelli of Continental indicating that "we will move our closing date or at least append the closing date to indicate we'll have to get through a [right of first refusal] period with Twitter" and that "the fund can't close til Twitter signs off."[33]  That same day, Hanson informed Andrea Porcelli of Continental that Twitter told him that potential investors could contact Twitter's Public Relations department "directly regarding the sale of stock."[34]

---

[29]     *See id.* ¶ 12.

[30]     *See id.* ¶¶ 52, 53.

[31]     *See id.* ¶ 52.

[32]     *See id.* ¶¶ 53, 55.

[33]     *Id.* ¶ 23.

[34]     *Id.* ¶ 32.

On September 10, 2012, Hanson sent Mark Porcelli an email stating that:

> GSV is an investor in Twitter – we've known Twitter for 3 years now.  Twitter is GSVC's largest position (12% of our Fund).  GSV is one of the few approved buyers of Twitter, being approved directly by Twitter's Board of Directors.  Twitter also gave GSV special permission to form this fund.  GSV knows Twitter as an investment intimately – we've built our GSVC position over the last 2 years.  GSV also has regular conversations with Twitter's management.[35]

Hanson represented "on all telephone calls and at investor meetings that GSV Asset was '1 of 7 approved buyers' and the only entity to have an allocation of Twitter shares."[36]

On September 12, 2012, Hanson showed plaintiffs a third-party shareholder list which indicated that thirty shareholders were going to sell over fourteen million shares of Twitter stock.[37]  Hanson indicated he was not authorized by Twitter to duplicate the list.[38]  The Complaint states that only Twitter had access to the information on the document.[39]

On September 15, 2012, Hanson told Continental that if it had a large

---

[35]    *Id.* ¶ 42.

[36]    *Id.*

[37]    *See id.* ¶ 30.

[38]    *See id.*

[39]    *See id.*

buyer, GSV Asset could arrange an inspection of Twitter's financial documents in a data room at Twitter's offices.[40]  Hanson indicated that this would be arranged directly with Twitter.[41]

Beginning on September 7, 2012 and ending on September 25, 2012, Hanson participated in twenty-seven road shows throughout Europe.[42]  At each road show, Hanson stated that GSV Asset was authorized by Twitter to sell $278,000,000 worth of third-party shareholder Twitter stock.[43]  This amounted to 14,631,579 shares at $19 per share, which was to be purchased on behalf of investors in @GSV.[44]

Hanson used what plaintiffs believed to be non-public information regarding Twitter's business model in slide shows.[45]  Plaintiffs believed the information in the slides came from Twitter.[46]  The sales projections in the materials turned out to be similar to those in Twitter's Registration Statement filed

---

[40]     *See id.* ¶ 39.

[41]     *See id.*

[42]     *See id.* ¶ 54.

[43]     *See id.* ¶¶ 53, 54.

[44]     *See id.* ¶ 43.

[45]     *See id.* ¶¶ 24-29.

[46]     *See id.* ¶ 24.

a year later on October 3, 2013.[47]  In addition, offering documents provided at the road shows were prepared by Wilson Sonsini.[48]

On October 2, 2012, several potential investors, but not the plaintiffs, took part in a teleconference.[49]  During the call, Nils Erdmann, Twitter's head of Investor Relations, Corporate Finance and Merger & Acquisitions, "confirmed that there were multiple third-party offerings at the same time – GSV and 1Oak."[50] Erdmann "represented that . . . [Twitter was] aware of the GSV presentations, and that GSV had been promoting the Third-Party shareholder Twitter stock, but maintained that only 1Oak had a right of first refusal."[51]

Erdmann indicated that Twitter was working with five funds which had right of first refusal status, and that Twitter was also working with other funds.[52]  When asked by an investor whether he was aware that GSV Asset "was also marketing a fund that was authorized by Twitter[,] Erdmann said that he was

---

[47]     See id.

[48]     See id. ¶ 67.

[49]     See id. ¶¶ 34-37.

[50]     Id. ¶ 34.

[51]     Id.

[52]     See id. ¶ 36.

aware that GSV was marketing a Twitter fund."[53]

## B.    Procedural History

Plaintiffs commenced this law suit by filing a complaint on October 20, 2013.  They filed their first amended complaint on November 25, 2013, which Twitter moved to dismiss.  In response to this motion, plaintiffs filed an opposition brief and a number of affidavits.  They also argued that were the Court inclined to grant Twitter's motion, they should be permitted to amend the amended complaint pursuant to Rule 15(a).

At a conference on February 19, 2014, I permitted the plaintiffs to amend their complaint over Twitter's objection.  I also entered an Order denying Twitter's motion to dismiss without prejudice.  Twitter filed the instant motion to dismiss after plaintiffs filed their Second Amended Complaint.

## III.    LEGAL STANDARD

### A.    Motion to Dismiss

In deciding a motion to dismiss under Rule 12(b)(6), the court must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."[54]  The court evaluates the complaint under the

---

[53]    *Id.* ¶ 37.

[54]    *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 137 (2d Cir. 2013) (citing *Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir.

"two-pronged approach" set forth in *Iqbal*.[55]  *First*, a court may "identify[]

pleadings that, because they are no more than conclusions, are not entitled to the

assumption of truth."[56]  "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice" to withstand a motion to

dismiss.[57]  *Second*, "[w]hen there are well-pleaded factual allegations, a court

should assume their veracity and then determine whether they plausibly give rise to

an entitlement for relief."[58]

A claim is facially plausible "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."[59]  Plausibility "is not akin to a probability

requirement," rather, plausibility requires "more than a sheer possibility that a

defendant has acted unlawfully."[60]

──────────────

2007)).

[55]     *See Iqbal*, 556 U.S. at 679.

[56]     *Bigio*, 675 F.3d at 173 (citing *Iqbal*, 556 U.S. at 678).

[57]     *Id.*

[58]     *Taveras v. UBS AG*, 513 Fed. App'x 19, 22 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. at 679).

[59]     *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

[60]     *Id.*

12

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider "only the complaint, . . . any documents attached thereto or incorporated by reference and documents upon which the complaint relies heavily."[61]  Allegations in the complaint that are "contradicted by more specific allegations or documentary evidence" are not entitled to a presumption of truthfulness.[62]

## B.    Pleading Requirements

### 1.    Rule 8

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."[63]  To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet the plausibility standard, as discussed above.[64]

### 2.    Rule 9(b)

All claims sounding in fraud must comply with Rule 9(b)'s

---

[61]    *Building Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012) (citing *In re Citibank ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011) (quotation marks omitted)).

[62]    *Kirkendall*, 707 F.3d at 175 n.1 (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

[63]    *Iqbal*, 556 U.S. at 677-78 (citing Fed. R. Civ. P. 8(a)(2)).

[64]    *See id.* at 678 (citing *Twombly*, 550 U.S. at 570).

heightened pleading standard.[65]  Under Rule 9(b), "a party must state with

particularity the circumstances constituting fraud . . . ."  "This pleading constraint

serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his

reputation from improvident charges of wrongdoing, and protect him against strike

suits."[66]

To comply with the requirements of Rule 9(b), a plaintiff must: "(1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent."[67]  "Allegations that are conclusory or unsupported

by factual assertions are insufficient."[68]

## IV.    APPLICABLE LAW[69]

### A.    Agency Under New York Law

---

[65]    *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184-185 (2d Cir. 2008).

[66]    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

[67]    *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

[68]    *ATSI*, 493 F.3d at 99.

[69]    "The law of the forum state governs where, as here, no party alleges that the law of a different state controls and differs from that of the forum."  *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451 n.43 (S.D.N.Y. 2009).

"'New York common law provides that an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'"[70] "'[T]here is no agency relationship where the alleged principal has no right of control over the alleged agent.'"[71]   An agent can have actual or apparent authority.

### 1.    Actual Authority

The "consent for actual authority may be either express or implied from the parties' words and conduct as construed in light of the surrounding circumstances."[72]  Express authority is conferred by a principal to an agent by

---

[70]    *Bigio*, 675 F.3d at 175 (quoting *N. Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001)).  *Accord Elbit Systems, Ltd. v. Credit Suisse Group*, 917 F. Supp. 2d 217, 225 (S.D.N.Y. 2013) ("Agency reflects mutual consent: the agent must consent to act subject to the principal's direction and control, and the principal must consent to exercising control over the agent.") (quotation marks omitted).

[71]    *Star Energy Corp. v. RSM Top-Audit*, No. 08 Civ. 00329, 2008 WL 5110919, at *2 (S.D.N.Y. Nov. 26, 2008) (quoting *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 657 F. Supp. 1475, 1481 n. 2 (S.D.N.Y. 1987)).

[72]    *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 435 (S.D.N.Y. 2010) (quotation marks omitted).  *Accord Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010) ("Actual authority is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware.'" quoting *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997)).

distinct and plain words, which may be communicated orally or in a written document.[73]  "[I]mplied authority exists when verbal or other acts by a principal reasonably give the appearance of authority to the agent."[74]  "Importantly, whether such an agency exists depends upon the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship."[75]

## 2.   Apparent Authority

Where a putative agent lacks actual authority, a principal may be liable for that party's fraudulent conduct if the "principal has created the appearance of authority, leading . . . [another] party to reasonably believe that

---

[73]     *See, e.g.*, *Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entm't Servs.*, No. 93 Civ. 2680, 1996 WL 263008, at *8 (S.D.N.Y. May 17, 1996).

[74]     *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 260-61 (S.D.N.Y. 2002) (quotation marks omitted).  Implied authority may also refer to "a kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers."  *Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 919 (S.D.N.Y. 1984).  "The general rule in New York with regard to implied authority is that an agent employed to do an act is deemed authorized to do it in the manner in which business entrusted to him is usually done."  *Id.* (quotation marks omitted).

[75]     *Manchester Equip. Co., Inc. v. American Way*, 60 F. Supp 2d 3, 8 (E.D.N.Y. 1999).  *Accord Itel Containers Int'l Corp. v. Atlantrafik Express Serv. Ltd.*, 909 F.2d 698, 702 (2d Cir. 1990).

16

actual authority exists."[76]  In contrast to actual authority, where the focus is on the principal's manifestations to the agent, the existence of apparent authority hinges upon the principal's communications to the third party.[77]  Thus, "[t]o adequately plead the existence of apparent authority, a plaintiff must allege 'words or conduct *of the principal*, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction on behalf of the principal.'"[78]  In addition, the third party's reliance on the misleading conduct of the principal must be reasonable.

### 3.    Ratification

Under the doctrine of ratification:

> Even in the absence of actual or apparent authority, a person may still be liable as a principal if he affirms or ratifies an act done by one who purports to be acting for the ratifier.  Under New York law, it is possible to imply ratification if the principal retains the

---

[76]    *Highland*, 607 F.3d at 328.  *Accord Peltz*, 115 F.3d at 1088 ("Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf.") (quotation marks omitted).

[77]    *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 90 (S.D.N.Y. 2010) ("The core principle that underlies the theory of apparent authority is that a third party must have relied on the misrepresentations of the agent because of *some misleading conduct on the part of the principal* – not the agent.") (quotation marks omitted) (emphasis in original).

[78]    *Id.* (quoting *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 486 (S.D.N.Y. 2001)) (emphasis in original).

17

benefit of an unauthorized transaction with knowledge of the material facts.  Thus, ratification is a form of retroactive activity that occurs when the principal, having knowledge of the material facts, accepts the benefits of the agent's action already made on his behalf.[79]

"Key to the concept of ratification is intent, express or implied, to affirm or adopt the acts of another."[80]  Significantly, "[t]o ratify the unauthorized act of an agent, a principal must have full and complete knowledge of all the material facts of the transaction."[81]  In addition, the intent to ratify an act "must be clearly established and may not be inferred from doubtful or equivocal acts or language."[82]

## B.    Fraud

A fraud claim under New York law has five elements.  To state a

---

[79]    *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 318 (S.D.N.Y. 2006) (quotation marks, alterations, and citations omitted).

[80]    *Orix Credit Alliance v. Phillips-Mahnen, Inc.*, No. 89 Civ. 8376, 1993 WL 183766, at *5 (S.D.N.Y. May 26, 1993).

[81]    *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199, 1213 (S.D.N.Y. 1994).  *Accord Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland Ltd.*, 835 F.2d 32, 36 (2d Cir. 1987) ("Ratification requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts, in circumstances indicating an intention to adopt the unauthorized arrangement."); *Breen Air Freight, Ltd. v. Air Cargo, Inc.*, 470 F.2d 767, 773 (2d Cir. 1972) ("Under the law of agency ratification can only occur when the principal, having knowledge of the material facts involved in a transaction, evidences an intention to ratify it.").

[82]    *Chemical Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999).

18

claim for fraud a plaintiff must adequately plead "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."[83]  A fraud claim must satisfy the requirements of Rule 9(b).

## V.    DISCUSSION

### A.    The Conduct Alleged in the Complaint Does Not Give Rise to a Plausible Inference of an Agency Relationship

#### 1.    Actual Authority

Plaintiffs' arguments touch on, and often confuse, various theories of agency.[84]  However, plaintiffs appear to concede that GSV Asset did not have actual authority to act as Twitter's agent.[85]  In any event, the Complaint and

---

[83]    *Solow v. Citigroup, Inc.*, 507 Fed. App'x 81, 83 (2d Cir. 2013) (citing *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)).

[84]    Another problem is that plaintiffs "draw no distinction between (1) whether GSV Asset had a right of first refusal (*i.e.* had "authority" to acquire Twitter stock) and (2) authority to act as Twitter's agent."  Twitter's Reply Memorandum of Law in Further Support of Defendant's Motion to Dismiss the Second Amended Verified Complaint at 2 n.2.

[85]    *See* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Opp. Mem."), at 10 ("Twitter authorized GSV Asset to act as its agent through its actions and omissions while the sale of Twitter shareholders' stock was being promoted. . . .  Twitter did not need to expressly state that they authorized GSV Asset to act as its agent.").  In addition, the Complaint alleges that on October 2, 2012, Twitter denied that GSV Asset had a right of first refusal to

plaintiffs' arguments[86] are directed at apparent authority and ratification, to which I now turn.

### 2.    Apparent Authority

To plead apparent authority, the Complaint must contain allegations that Twitter's statements to or interactions with plaintiffs gave rise to a reasonable belief that GSV Asset had authority to act as Twitter's agent.[87]  The Complaint is deficient because it does not contain a single allegation that Twitter communicated with plaintiffs.[88]  In fact, the Complaint concedes that plaintiffs never interacted with Twitter.[89]

Instead, plaintiffs argue that they "reasonably believed" that GSV

_____

sell Twitter third-party stock.  *See* Complaint ¶ 34.

[86]    For example, plaintiffs use the term "implied authority" but cite to cases addressing apparent authority.  *See* Opp. Mem. at 11, 12.  While plaintiffs do seem to suggest that providing the shareholder list and other confidential information is a basis for implied actual authority (*see id.* at 13-14), merely providing a non-agent with confidential information neither transforms that party into an agent nor provides a basis for another party to reasonably infer that he is dealing with an agent of the principal.

[87]    *See Spagnola*, 264 F.R.D. at 90.

[88]    While the Complaint alleges that GSV Asset told plaintiffs that it was Twitter's agent, "[a]n 'agent cannot confer authority upon himself or make himself an agent merely by saying that he is one.'"  *Star Energy Corp.*, 2008 WL 5110919, at *5 (quoting *Nuevo Mundo Holdings v. PriceWaterhouseCoopers LLP*, No. 03 Civ. 0613, 2004 WL 112948, at *6 (S.D.N.Y. Jan. 22, 2004)).

[89]    *See* Complaint ¶¶ 9, 34-38; Opp. Mem. at 8-9.

Asset was Twitter's agent because GSV Asset used the same attorneys as Twitter and GSV Asset had access to Twitter's highly confidential information.[90]  Neither GSV Asset's use of the same attorneys nor its access to confidential information describes an interaction between plaintiffs and Twitter.  In any event, providing a non-agent with confidential information does not transform that party into an agent or give rise to a reasonable belief that he is.

Plaintiffs make two related arguments to overcome this defect. Relying on *Property Advisory Group v. Bevona*,[91] they contend that apparent authority does not always require direct contact between a third-party and a principal.[92]  They separately argue, again relying on *Property Advisory Group*, that they can rely on GSV Asset's conduct to establish agency because it is standard practice in the securities industry for parties to deal directly with a lead underwriter and not the principal.[93]

*Property Advisory Group* does not support plaintiffs' arguments.  In that case, the agent was given express authority by the principal.  However,

---

[90]     *See* Opp. Mem. at 11.

[91]     718 F. Supp. 209, 211 (S.D.N.Y. 1989).

[92]     *See* Opp. Mem. at 9-12.

[93]     *See id.* at 17-19.

contrary to customary practice in the industry, the principal limited the scope of

that authority to exclude entering into union contracts.[94]  When the contracting

party attempted to enforce the contract's arbitration clause, the principal filed a suit

seeking a declaratory judgment that it was not bound by the contract.[95]  Even

though the contracting party and the principal had no prior dealings, the court held

that the principal was estopped from denying liability.[96]  This holding was based on

the longstanding doctrine that a principal cannot deny an agent's authority when he

places a hidden limitation on an agent's authority that is contrary to the usual

custom in the industry.[97]

        By contrast, the Complaint here does not plausibly allege that Twitter

---

[94]        *See Property Advisory Group*, 718 F. Supp. at 211 ("An express
agency relationship did not exist between Cooper Hill and Fidelity because their
contract specifically limited the power of the manager to bind the owner to any
type of union contract or collective bargaining agreement.").

[95]        *See id.* at 209-10.

[96]        *See id.* at 211.

[97]        *See id.* ("Where a principal by his voluntary act placed an agent in
such a situation that a person of ordinary prudence conversant with business usages
and the nature of the particular businesses is justified in assuming that such agent
has authority to perform a particular act and deals with the agent upon that
assumption, the principal is estopped as against such third person from denying the
agent's authority.") (quotation marks omitted).  Thus, in these circumstances,
"[t]he appointment of a person to a position with generally recognized duties may
create apparent authority."  *Id.* (citing *First Fidelity Bank, N.A. v. Government of
Antigua & Barbuda*, 877 F.2d 189, 193 (2d Cir. 1989)).

22

granted GSV Asset express authority to act as its agent for any purpose. Moreover, the Complaint does not allege that Twitter secretly limited that authority contrary to the standard practice in the securities industry.

Plaintiffs also suggest that Twitter's silence or failure to act is a basis for agency by estoppel.[98] As a general rule, a principal will be bound by actions outside the scope of an agent's authority when the principal knew of the unauthorized actions and took no action.[99] Leaving aside GSV Asset's lack of actual authority, the Complaint does not plausibly allege that Twitter knew about GSV Asset's dealings with plaintiffs until, perhaps, three days before GSV Asset canceled the deal.[100] Accordingly, the Complaint does not allege apparent authority.[101]

_____

[98]      *See, e.g.*, Opp. Mem. at 14-15.

[99]      *See Municipality of Bremanger v. Citigroup Global Mkt. Inc.*, No. 99 Civ. 7058, 2013 WL 1294615, at *21 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 2014 WL 593188 (2d Cir. Feb. 18, 2014); *Musicians & Emps.' Pension Fund v. Steven Scott Enters.*, 40 F. Supp. 2d 503, 511 (S.D.N.Y. 1999) ("[T]he court concludes that the Pension Fund's acts of continually cashing all fifteen settlement checks while failing to repudiate Moriarity's unauthorized actions after receiving notice of at least seven settlement agreements created the appearance of authority that Steven Scott reasonably relied on. . . . Thus, the Pension Fund's silence may be construed as an affirmation of Moriaity's exercise of apparent authority.").

[100]      *See infra* Part V.A.3.

[101]      *See Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989) ("Second Circuit case law supports the view that apparent authority is created only

### 3.    Ratification

Plaintiffs next claim that the Complaint supports a ratification theory of agency.[102]  To plead ratification, the Complaint must contain allegations that Twitter had "knowledge of the material facts relating to the transaction" and intentionally failed to put a stop to it.[103]  The Complaint's allegations fall far short of permitting an inference that Twitter knew that GSV Asset was holding itself out as Twitter's agent and failed to take action to prevent it from doing so.

The Complaint states that Twitter knew that plaintiffs entered into the Mandate Agreements with GSV Asset.[104]  However, each of the allegations in the Complaint used to support this claim are insufficient, whether viewed separately or together.[105]  Plaintiffs argue that "Twitter knew that GSV Asset was entering into Mandate Agreements with Plaintiffs . . . as their counsel drafted all the legal documents."[106]  But Wilson Sonsini has numerous clients and there is no basis to

by the representations of the principal to the third party, and explicitly rejects the notion that an agent can create apparent authority by his own actions or representations.").

[102]    *See* Opp. Mem. at 14-17.

[103]    *Municipality of Bremanger*, 2013 WL 1294615, at *21.

[104]    *See* Complaint ¶¶ 9, 44.

[105]    *See id.* ¶¶ 21-45.

[106]    *See, e.g.*, Opp. Mem. at 15.

infer that its clients have knowledge of what the firm is doing for other clients.[107]
The Complaint does not provide any basis to believe that Twitter was somehow
controlling Wilson Sonsini or that Wilson Sonsini violated its fiduciary and ethical
obligations to protect its clients' confidences.

Plaintiffs also state that various documents shown to them and third-
parties by GSV Asset could only have come from Twitter.  The inference plaintiffs
wish to draw from this is that Twitter must have known about GSV Asset's
dealings with plaintiffs.  But even if Twitter provided projections and a stockholder
list to GSV Asset, it does not follow that Twitter knew that GSV Asset was holding
itself out as an agent.  These allegations cannot support the inference that Twitter
had "knowledge of all the material facts of the transaction[s]" between GSV Asset
and plaintiffs.[108]

Finally, plaintiffs point to the October 2, 2012 teleconference, during
which Nils Erdmann, Twitter's head of Investor Relations, Corporate Finance and
Merger & Acquisitions, indicated that Twitter was "aware of the GSV
presentations, and that GSV had been promoting the Third-Party shareholder

---

[107]     *See, e.g.*, *In re Perle*, 725 F.3d 1023, 1028 (9th Cir. 2013) ("Perle has
identified no case, nor are we able to find one, that imputes to a client knowledge
that his lawyer gained while representing a different client.").

[108]     *Banque Arabe*, 850 F. Supp. at 1213.

25

Twitter stock, but maintained that only 1Oak had a right of first refusal."[109]
Erdmann's statements during the call do not support plaintiffs' ratification theory.

   Plaintiffs' entry into the Mandate Agreements occurred months *before*
the October 2, 2012 teleconference.  The Complaint does not support an inference
that Twitter failed to act upon learning that GSV Asset was holding itself out as its
agent.  Plaintiffs argue that "[e]ven after being contacted by accredited investors
[on October 2, 2012], Twitter did not contact GSV Asset and require them to stop
offering the Twitter stock."[110]  But the Complaint makes no such allegation.  To the
contrary, the Complaint states that just three days after the conference call, GSV
Asset told plaintiffs that the proposed deal was cancelled.[111]  Erdmann's statement
on the call that GSV Asset did not have a right of first refusal also undercuts
plaintiffs' suggestion that Twitter failed to take steps to stop GSV Asset from
making that representation.  Thus, the Complaint does not permit an inference
based on the October 2, 2012 conference call that Twitter failed to act upon

---

[109]  Complaint ¶ 34.

[110]  Opp. Mem. at 16.

[111]  *See* Complaint ¶ 64.  The Complaint states that on September 4, 2012,
Hanson informed a principal of Continental that "Twitter had no problem being
contacted directly regarding the sale of stock . . . ." *Id.* ¶ 32.  However, the
Complaint does not claim that plaintiffs ever contacted Twitter directly after
September 4, 2012.  The only direct contact with Twitter alleged in the Complaint
was on October 2, 2012, and even that was by third-parties, not plaintiffs.

learning of GSV Asset's conduct.

In sum, the Complaint does not successfully plead an agency relationship between GSV Asset and Twitter by actual authority, apparent authority, or ratification. As plaintiffs concede, the viability of their fraud claim hinges upon the agency theory just rejected.[112] Accordingly, Twitter's motion to dismiss is granted.

## VI.   CONCLUSION

For the foregoing reasons, Twitter's motion to dismiss is GRANTED with prejudice.[113] The Clerk of the Court is directed to close this motion (Docket No. 31) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 21, 2014

---

[112]   See Opp. Mem. at 19-20.

[113]   I gave plaintiffs the opportunity to amend the First Amended Complaint with the understanding that it would be plaintiffs' last opportunity to attempt to state a claim. Plaintiffs have not requested permission to make a third amendment, and there is no reason to believe that granting leave to amend the complaint a third time would be productive.

27

**- Appearances -**

**For Plaintiffs:**

Joseph Peter Baratta, Sr., Esq.
Ottavio Vincenzo Mannarino, Esq.
Baratta, Baratta & Aidala LLP
597 Fifth Avenue
New York, NY 10036
(212) 750-9700

**For Defendant:**

Bruce Domenick Angiolillo, Esq.
Jonathan K. Youngwood, Esq.
Daniel Joseph Stujenske, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000